LOUIS SCHLESINGER COMPANY, PLAINTIFF-APPELLANT, v. SAMUEL W. RICE, HELEN B. RICE AND LEO MARKS, DEFENDANTS-RESPONDENTS.

Argued February 6, 1950—Decided March 13, 1950.

*Mr. Charles Danzig* argued the cause for appellant (*Messrs. Riker, Emery & Danzig,* attorneys).

*Mr. Meyer E. Ruback* argued the cause for the respondents Rice (*Messrs. Ruback, Albach & Weisman,* attorneys).

*Mr. Sidney G. Goldberg* argued the cause for the respondent Marks.

The opinion of the court was delivered by

HEHER, J. The controversy here grows out of a real estate brokerage contract. On June 19, 1946, the defendants Rice leased their lands known as 288 Frelinghuysen Avenue, in Newark, to the Ken-Rod Manufacturing Co. for a term of

ten years commencing the ensuing August 1st, at an annual rental of $46,800. The lease was negotiated by the plaintiff broker; and on the day of the execution and delivery of the instrument, the Rices agreed in writing to pay plaintiff brokerage at the rate of 5% of the annual rent reserved, the commission on the first year's rental to be payable forthwith and the remainder in five equal annual installments of $4,212, provided the lessee had not defaulted and was still in possession of the demised lands, the first installment to be payable August 1, 1948. Termination of the lease by the lessee's default would extinguish the "right to further brokerage;" but in that event plaintiff should "have the exclusive agency for the renting of the demised premises, upon terms as favorable or more favorable in respect of rent, duration of lease and the other provisions contained" in the lease with Ken-Rod, the exclusive agency to be "limited in time to three months from the time the said tenant goes out of possession or is put out of possession." It was further stipulated that in case plaintiff procured "within said three months * * * a new tenant upon the aforesaid terms or any terms acceptable" to the Rices, it should have brokerage at the rate of 5% of the rental reserved in the new lease, payable annually on the rent reserved for the current year if the tenant had not defaulted. Ken-Rod reserved the right to sublet the demised premises and to assign the lease; and in the summer of 1947, it assigned the lease to Breimor Realty Co., who in turn sublet 18,000 square feet of the space demised, 25% of total, to Smith Engineering Corporation. Breimor paid the rent for the demised premises while it was in possession. It went out of possession April 25, 1948, having paid the rent for that month. Smith remained in possession of the space thus sublet. On May 19, 1948, Breimor formally surrendered the lease to the Rices; and on the 21st of that month the Rices accepted from Smith rent for the month for the space held by it. Smith vacated at "the end" of that month.

The complaint is in two counts: The first alleges an exclusive agency in plaintiff for three months commencing May 1, 1948, when the "tenant procured by" plaintiff "defaulted and

went out of possession of the premises," efforts made and expense incurred by plaintiff in the performance of its undertaking, the renting of the premises to General Motors Corporation for a term of ten years beginning August 1, 1948, at an annual rental of $37,800, and the accrued right to a commission of 5%; the gist of the second count is a "malicious" and "unlawful interference" by the Rices and defendant Marks, also a real estate broker, designed to deprive plaintiff of the fruits of its contract by contriving to negotiate a lease of the lands to General Motors during the term of plaintiff's exclusive agency and to divert the commission to Marks.

After depositions taken at the instance of plaintiff to unfold the circumstances attending the negotiation of the lease to General Motors, and a supplemental stipulation of facts, argument was had on cross motions for a summary judgment pursuant to *Rule* 3:56–1 *et seq.* for want of a genuine issue of fact, so it was said. The motions of the Rices and Marks were granted, and the motion of plaintiff denied, and judgments interlocutory and final were entered accordingly. The Judge found that plaintiff's exclusive agency began May 1, 1948, "the date of the default of the tenant under the pre-existing lease," and terminated on the succeeding August 1st; that while plaintiff on June 14, 1948, "did circularize General Motors, among other persons, firms and corporations," there were no ensuing negotiations, and it conclusively appeared that plaintiff was not "the effective, procuring cause" of the later lease to that corporation, "which was signed by the tenant on August 6, 1948, and by the landlord-defendants on August 9, 1948, * * * subsequent to the expiration of the exclusive agency;" and that "the acts of" defendants did not constitute "a fraudulent attempt to deprive the plaintiff of the fruits of its labors." In short, the Judge reasoned that plaintiff had not found a purchaser "able and willing to buy" on the prescribed terms before the expiration of its exclusive agency, and there had been no fraudulent interference with plaintiff's efforts to effect a sale. He cited the principle of *Loxley v. Studebaker*, 75 *N. J. L.* 599 (*E. & A.* 1907).

Plaintiff's appeal to the Appellate Division of the Superior Court was certified here on our own motion.

There was error in the challenged judicial action. The evidence raised issues of fact which precluded a summary judgment as a matter of law.

The plaintiff broker assumed that the tenant under the original lease defaulted and surrendered possession of the demised premises on May 1, 1948. On the prior April 29th, in anticipation of the surrender of the premises, it advised the Rices by letter of its intention to proceed under the agreement for "an exclusive agency on your property * * * for a period of three months commencing May 1, 1948, on which date we understand the present tenant surrenders their leasehold," and to undertake an advertising campaign by signs, newspapers and circulars directed to concerns selected from its "specialized mailing list," which included the General Motors, for the sale of the property at the stipulated price "and for lease for a minimum ten year period at 65c per square foot ($46,800) per annum." There was no dissent from this statement of the period of the exclusive agency. The Rices knew the circumstances attending the surrender of possession; plaintiff did not. On the ensuing August 3rd, not knowing of the time of the surrender of the lease or of the existence of the sublease and the sublessee's continued possession until the latter part of the prior May, plaintiff removed their rent signs from the premises and returned the key to the Rices with a letter stating that it would "continue to use every effort to lease or sell the property." Breimor's surrender of the lease to the Rices did not terminate Smith's right of possession under the sublease. The subterm was not thereby extinguished. *Shaw v. Creedon,* 133 *N. J. Eq.* 397 (*Ch.* 1943). The complaint counts upon an exclusive agency expiring August 1, 1948.

There is evidence tending to show that the lease was negotiated by the Rices through the instrumentality of the second broker, Marks, during the period of plaintiff's exclusive agency, and that its execution and delivery were deferred until after August 1, 1948, in the belief that plaintiff's ex-

clusive agency would then have expired and all its rights thereunder would have been extinguished.

Following its letter of April 29th, plaintiff erected signs on the demised premises, advertised their availability and facilities in Newark and New York newspapers, circulated by mail and otherwise a description of the premises and the rental price and other pertinent information, and exhibited the premises to interested persons, all at a cost of $823.73, exclusive of incidental telephone calls, the expense incurred by salesmen in personal calls upon prospective customers, and general overhead. On June 14, 1948, by letter addressed to General Motors at its New York office, plaintiff offered the property for sale at the price of $375,000 and for rent at the rate of 65c per square foot. A day. or two thereafter, real estate brokers of New York City and other representatives of General Motors were shown the premises by Rudd, an associate of Marks. On the 16th, 17th or 18th of the month, Rudd and Marks informed Samuel W. Rice of General Motors' interest in the property. It is conceded that Rudd and Marks then knew of plaintiff's exclusive agency. Rudd told Rice in this conversation that he "didn't want to infringe on any exclusive agency;" that Marks "had a co-broker," and was "really interested in receiving 5%." Rice replied: "You go ahead and make your deal, and I will take care of Schlesinger." Again, Rudd said: "I had explicit instructions from the landlord. I was told definitely don't worry, go ahead and make your deal, and that is enough for me." Marks and Rudd proceeded accordingly. And it is reasonably inferable from the proofs that then or shortly thereafter Marks was authorized by the Rices to offer a lease of the premises for a term of ten years at the rate of 52½c per square foot, or a total rental of $37,800, and that plaintiff was not given the same terms nor advised of the lower price to Marks. Only the rental was then unsettled in the negotiations with General Motors. On June 22nd following, Marks wrote General Motors that Rice had authorized him to prepare a lease of the building for ten years at a rental of 52½c per gross square foot per annum; and on the same day he wrote to the New York brokers repre-

senting General Motors that he recognized them "as co-brokers on a 50-50 basis."

Immediately after the first meeting with Rice, Rudd undertook, with Rice's cooperation, to arrange the engineering and mechanical details necessary to consummate the lease, relating to water and power facilities and other utilities, railroad connections, and so on. All this took time. By July 14th, the Frigidaire Management of General Motors had approved a lease of the building for ten years at the rental offered by Marks in his letter of the prior June 22nd, subject to the approval of General Motors Operations Policy Committee, whose scheduled meeting of June 22nd to consider the matter had been postponed until June 29th due to the absence of several members on vacation. On the succeeding July 27th, a draft lease came from General Motors in accordance with a request made by Rudd two weeks before. On the evening of that day, it was submitted to counsel for the Rices, Mr. Ruback, who said that he could not examine it then because of a temporary indisposition, but that he would do so without delay and that if the draft lease and copies were signed by the Rices, "they were not to be transmitted until August 1st to the Detroit people;" that they "must not go to Detroit until the exclusive agency expired" on August 1st. This is all conceded by Mr. Ruback; indeed, he established the fact by cross-examination of Marks. On the following day, the Rices executed the draft leases after the making of certain interlineations by Mr. Ruback; and they were mailed on the 29th to General Motors at Detroit. Marks explained that the failure to heed Mr. Ruback's instructions as to the time of mailing was due to Rudd's overzealousness.

On the 29th, the Operations Policy Committee of General Motors approved the lease. When the executed lease reached General Motors, it was redrafted to include the interlined changes and to substitute the General Motors (Frigidaire Division) in the place of Frigidaire Sales Corporation as the lessee. The lease, so drawn, was executed by General Motors and forwarded to Marks on August 6th with a letter stating that the "only change in the new forms is in the name of the

lessee," which was done because the "Frigidaire Division requires this space, and it was so approved by our Committee," and that "the remaining three copies of the previous forms signed by the lessors now held by our Legal Department" will be forwarded upon the return of the enclosed lease executed by the Rices. The Rices signed and acknowledged the lease on August 9th; and it was forwarded to General Motors, who on August 12th returned "for cancellation" the "three copies of the agreement dated August 1, 1948," signed by the Rices "prior to the execution of the new forms which have now been completed."

## I.

Plaintiff's was not a mere "revocable, naked power, an offer to pay for services when rendered if performed within the limited period and before revocation," as in *Ettinger v. Loux*, 96 *N. J. L.* 522 (*E. & A.* 1921) but rather an authority coupled with an interest irrevocable during the stipulated period of its existence. Even a bare offer of such agency may give rise to mutuality and ripen into a contract by the exertion of effort and the expenditure of money in the pursuit of the agency. Here, an exclusive agency for the period limited was granted to plaintiff in consideration of a *pro rata* adjustment of commissions for services rendered in the procuring of the first tenant in the event of his default before the expiration of the term of that demise.

An exclusive agency precludes the landowner, during the period of the agency, from appointing another agent to accomplish the thing sought. Unlike an exclusive right to sell, the grant of such an agency does not bar competition by the principal himself, unaided by a broker. *Ettinger v. Loux, supra; Klie v. Hollstein*, 98 *N. J. L.* 473 (*E. & A.* 1923); *Martin Realty Co. v. Fletcher*, 103 *N. J. L.* 294 (*Sup. Ct.* 1927). Compare *Maxwell v. Staulcup*, 103 *N. J. L.* 509 (*Sup. Ct.* 1927). See, also, annotations in 64 *A. L. R.* 404. In the case of an exclusive agency, the owner undertakes not to sell the property through the medium of another broker;

he is not precluded from selling to a purchaser of his own procuring. *Harris v. McPherson,* 97 *Conn.* 164, 115 *A.* 723, 24 *A. L. R.* 1530 (1922). This is the commonly recognized characteristic of the exclusive agency. *Restatement, Agency,* § 449.

There is no contention that the lease was negotiated by the Rices alone. During the period of plaintiff's exclusive agency, not long after the beginning of the term, a jury might well find, the Rices appointed Marks as their agent to negotiate a lease of the property, and Marks undertook the assignment knowing of the existence of the exclusive agency; and it is now the insistence of the Rices that the lease with General Motors was made through the instrumentality of Marks, to whom they paid a commission.

We do not entertain the view that the proofs adduced in support of the motion for a summary judgment sustain the proposition that the lease was of plaintiff's procuring so as to entitle it to an earned commission. But there is evidence of a breach by the Rices of the contract for an exclusive agency; and for such a breach they are answerable in damages. We need not determine now whether the exclusive agency continued until Ken-Rod's successor in possession terminated the lease in compliance with the Rices' demand and the sublessee had vacated the premises. The evidence indicates that at a time when the exclusive agency indisputably subsisted, the Rices appointed Marks as their agent to lease the property on terms more favorable than those submitted to plaintiff; and plaintiff has an action in damages for this breach of the contract. It may well be that when all the evidence is in, and sifted and tested for testimonial trustworthiness, there will be reasonable ground for the inference that, but for the interference by the Rices and Marks, in combination, plaintiff would have negotiated a lease with General Motors. It is also reasonably inferable that the lease was negotiated prior to August 1st, and there was a design to defer formal execution until after that date in an effort to defeat plaintiff's contractual rights. Delay in execution as a strategem to avoid the obligation of the contract would be

ineffectual; it would not serve to alter the essence of what had gone before. All other considerations aside, Marks had earned his commission before August 1st. The agent performs his undertaking when he procures a tenant on satisfactory terms. *Freeman v. Van Wagenen,* 90 *N. J. L.* 358 (*Sup. Ct.* 1917); *Lindley v. Keim,* 54 *N. J. Eq.* 418 (*E. & A.* 1896).

It is said that plaintiff did not learn of the agency of Marks and the lease to General Motors until after the termination of its exclusive agency, and since it did not procure a tenant able and willing to lease the premises on the owner's terms, it is not entitled to a commission. The case of *Garibaldi v. Rubenstein,* 99 *N. J. L.* 223 (*E. & A.* 1923), is invoked for this proposition. But under the principle of that case, plaintiff is entitled to such damages as it may have suffered by reason of the breach of the contract for an exclusive agency.

We have no occasion to consider the question of the measure of damages for the breach of contract charged here. The elements entering into the computation of the damage may depend upon the circumstances as they are finally developed. The question has not been argued; and we think it suffices merely to state the principle which governs the contractual relations of the parties. Generally, the recoverable damage for a breach of contract is the loss directly and naturally ensuing from the breach in the ordinary course of events. It comprises such losses as would probably result in the ordinary course of things from a breach of the contract under the special circumstances known to the parties at the time it was made. *Marcus & Co., Inc., v. K. L. G. Baking Co., Inc.,* 122 *N. J. L.* 202 (*E. & A.* 1939).

## II.

And it was error to direct judgment for Marks. The right to pursue one's business, calling or occupation free from undue interference or molestation is one which may not be infringed with impunity. As we have seen, the complaint charges a "malicious" and "unlawful interference" with plain-

tiff's contractual right to an exclusive agency, and thereby to divert the commission to Marks. The applicable principles are considered in *Louis Kamm, Inc., v. Flink,* 113 *N. J. L.* 582, 99 *A. L. R.* 1 (*E. & A.* 1934). Malicious interference with one's business is actionable. The luring away by devious, improper and unrighteous means of the customer of another falls into this category. If the disturbance or loss to one in his business is a mere incident "of competition, or the exercise of like rights by others, it is *damnum absque injuria,* unless some superior right by contract or otherwise is interfered with. But if it comes from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, it then stands upon a different footing." *Walker v. Cronin,* 107 *Mass.* 555 (1871). An injury to a person's business "by procuring others not to deal with him, or by getting away his customer, if unlawful means are employed, such as fraud or intimidation, or if done without justifiable cause, is an actionable wrong." 2 *Cooley on Torts* (4th) § 230. One who "maliciously or without justifiable cause induces a person to break his contract with another will be liable to the latter for the damages resulting from such breach;" and this is so even though the contract be unenforceable because within the Statute of Frauds. *Ibid.,* § 227. Merely to persuade a person to break his contract may not be wrongful "in law or in fact;" but if "the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant, at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act if injury ensues from it." *Bowen v. Hall, L. R.* 6 *Q. B. D.* 333; 50 *L. J. Q. B.* 305; 7 *Eng. Rul. Cas.* 717.

One who without justification or excuse procures A to break his contract with B, and thereby willfully induces the breach of a legal right, is liable for the ensuing damage. Although a broad extension of the older law, this rule is but the application of the principle that "a violation of legal right committed knowingly is a cause of action. * * * It is a vio-

lation of legal right to interfere with contractual relations recognized by law, if there be no sufficient justification for the interference." *Quinn v. Leathem* (1901), *A. C.* 495, 510, per Lord Macnaghten. See *Lumley v. Gye* (1853), 2 *El. & B.* 216, 118 *Eng. Reprint* 749; also, *Salmond on the Law of Torts* (10*th Ed.* 1945), 362 *et seq.* It is not a good answer to say that B has his remedy against A for the breach of the contract, and had none other in view, and A's motive for breaking the contract is irrelevant. One who maliciously induces the breach of a contract such as this is liable *ex delicto* for the invasion of a legal right to performance of the contract.

 Malice in the legal sense is the intentional doing of a wrongful act without justification or excuse. And a "wrongful act" is any act which in the ordinary course will infringe upon the rights of another to his damage, except it be done in the exercise of an equal or superior right. This is the English definition which has long prevailed in this State. *Bromage v. Prosser,* 4 *B. & C.* 247; 10 *E. C. L.* 321; 107 *Reprint* 1050; 1 *C. & P.* 475; *Quinn v. Leathem, supra; Leitch & Co. v. Leydon* (1931), *A. C.* 90; *British Homophone v. Kunz* (1935), 150 *L. T.* 589; *British Industrial Plastics v. Ferguson* (1940), 162 *L. T.* 313; *Brennan v. United Hatters,* 73 *N. J. L.* 729 (*E. & A.* 1906). Malice may be inferred from the absence of just cause or excuse. Unjustifiable interference with the contractual relation is an actionable wrong, whether the contract stipulated for personal service or not. Such interference is not justified for the indirect purpose of benefiting the actor at the expense of another, unless done in the exercise of an equal or superior right. See *Salmond on the Law of Torts, p.* 364.

 Marks knew of plaintiff's exclusive agency; and therefore he also knew that his appointment as the agent of the Rices for the same purpose was in violation of their contract with plaintiff. True, he disclaims an intention to profit at plaintiff's expense by this unwarranted intrusion upon plaintiff's contractual rights, citing the promise that the Rices would "take care" of plaintiff. But obviously this is

not conclusive of the issue. He was not thereby engaged in the exercise of an equal or superior right; and he was not justified in his course by the Rices' promise to satisfy plaintiff for the breach of his contract. The "morals of the market-place" do not sanction this deliberate invasion of plaintiff's contractual rights; neither does the law. What Marks said suggests an awareness of the nature and consequence of his act. The proofs adduced raise issues within the exclusive province of the triers of the facts.

The judgments are accordingly reversed.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, HEHER, WACHENFELD, BURLING and ACKERSON—6.

*For affirmance*—Justice OLIPHANT—1.