BYERS BROS. REAL ESTATE & INSUR-
ANCE AGENCY, INC., a Corporation,
Respondent,

v.

H. Howard CAMPBELL and Suburban
Realty Company, Inc., a Corpo-
ration, Appellants.

No. 23428.

Kansas City Court of Appeals.

Missouri.

Dec. 4, 1961.

Robert E. Coleberd, Hale, Coleberd, Kincaid & Waters, Liberty, for appellants.

Thaine Q. Blumer, Blumer & Wright, Kansas City, for respondent.

HUNTER, Presiding Judge.

This is an action for damages by plaintiff-respondent, Byers Brothers Real Estate and Insurance Agency, a corporation, for conspiracy to defraud plaintiff of his $400.-00 earned real estate commission under an exclusive real estate contract, against defendants-appellants, Suburban Realty Company, Inc., a corporation, and its employee, H. Howard Campbell. Plaintiff dismissed with prejudice as to the defendants, Mr. and Mrs. Browning, having compromised and settled its claim with them for $300.00.

On the first trial plaintiff received a verdict for $100.00 actual and $4,500.00 punitive damages. The trial court sustained defendants' motion for a new trial and this court affirmed because of the error committed by plaintiff in reading an unsigned deposition to the jury. See, Byers Bros.

**104**

Real Estate & Ins. Agency, Inc. v. Campbell, Mo.App., 329 S.W.2d 393.

On the second trial plaintiff received a verdict for $100.00 actual and $7,500.00 punitive damages. The trial court entered judgment accordingly, and this second appeal resulted.

The controversy arose as a result of the efforts of the Brownings to sell their house located in Clay County, Missouri. By a written contract dated April 8, 1957, they employed plaintiff company to sell the house agreeing " * * * that the Owner hereby appoints (plaintiff) as the sole and exclusive Agent for the sale of said property, at a price and terms as follows: ($8,750.00) or at any other price and terms with the consent of the Owner.

"This exclusive agency contract is irrevocable for a period of (30 days) days from the date hereof.

"If the property be sold or otherwise disposed of by anyone while this contract is in effect, the Owner agrees to pay the Agent a commission of Five (5) per cent on the gross amount of the sale, * * *."

Shortly thereafter (before April 16) and within the 30 day exclusive period defendant Campbell brought a Mr. and Mrs. Hughes to look at the house and they wanted to buy it. Mr. Browning testified Mr. Campbell told the Brownings that he had a buyer who would pay cash and that he had his name on a contract. Mr. Browning then advised Mr. Campbell that he and Mrs. Browning had given the sale of the property exclusively to another company, naming plaintiff company. "Q. So you told Mr. Campbell it was a 30-day exclusive, from April 8, 1957, and Mr. Campbell told you they would have the deeds dated after the expiration of Byers Brothers' contract? A. Yes, that is what he said." " * * * he told me they would postpone the final signing of the contract. * * * Q. After you executed this contract with the Hugheses, (on April 16, 1957) did Byers Brothers send any men by with

prospective purchasers? A. Yes. Q. What did you tell them about this sale to the Hughes? A. Well, I didn't tell them. Q. Did you show the house to the prospective purchasers? A. Yes. This Mr. Campbell told me not to—he told me to go ahead and show it just as little as possible and not to tell. Q. Mr. Campbell said not to tell Byers Brothers of the contract that you signed with the Hughes? A. Yes. * * * Did you ask him if you would have to pay Byers Brothers a commission? A. He said we wouldn't."

Defendant Campbell's testimony was substantially in accord. He admitted Mr. Browning told him, "Well, Mr. Campbell, we listed the house on an exclusive basis with another realty firm." He then reported this to Mr. Kuhn, president and principal stockholder of Suburban Realty Company, Inc., and Mr. Kuhn told him to go ahead and sell it anyhow. Mr. Kuhn in his testimony did not deny knowledge of the situation, and admitted he instructed defendant Campbell what to do.

During the 30-day exclusive agency period plaintiff, not knowing that the sale of the house had already been contracted frequently advertised it in the newspaper and on numerous occasions took prospective buyers to the house to show it. On such occasions either Mr. or Mrs. Browning would be present. On one occasion it took a prospective purchaser, Mr. Waters, to Mr. Browning, who first stated he would sell to Mr. Waters upon certain conditions, but upon those conditions being immediately agreed to, refused and said he would sell only on additional conditions to which Mr. Waters also agreed. Then, according to the testimony of Mrs. Waters, he proceeded to discourage and insult Mr. Waters by asking numerous questions. " * * * he (Browning) started discussing the house, the roof was leaking and I don't know what all. Then he was very rude to my husband. * * * he asked him where he worked, then he asked how old he was, how much he made, how long he'd been employed with the company, if he bought

the property did he think he could keep up the payments. * * * And several questions like that." Then Mr. Browning increased his terms again and Mr. Waters was discouraged and did not agree to them. The Brownings never revealed to plaintiff or Mr. Waters that they had already contracted to sell their house to the Hugheses for $8,000.00.

Some two weeks later plaintiff learned of the earlier sale to the Hugheses and that the Brownings had paid a 5% sales commission on the $8,000 sales price to defendant Suburban Realty Company. Defendants refused to pay any commission to plaintiff.

As their first point defendants assert the trial court erred in submitting the issue of punitive damages to the jury for the reason the case relates purely to the breach of a contract, and punitive damages are not recoverable in an action for a breach of contract. The difficulty with the contention is that the action is not one for damages for breach of contract but is premised on the alleged executed conspiracy of the defendants to sell the house under circumstances of secrecy and in such a manner as to defraud plaintiff of the $400.00 real estate commission it was entitled to receive under the terms of the contract. The evidence supports plaintiff's charge that the defendants with the intent of securing for themselves the commission for the sale of the Brownings' house conspired with the Brownings to defraud the plaintiff of the commission due plaintiff under the terms of the contract by concealing from plaintiff the fact a sale had been made within the exclusive period through such acts as post-dating various papers, by discouraging other potential buyers produced by plaintiff within the exclusive period, by conspiring to conceal and by concealing from plaintiff the fact that it was entitled to a commission and by receiving plaintiff's commission and retaining it.

The general subject has been well covered by our Supreme Court in Rosen v. Alside, Inc., Mo., 248 S.W.2d 638, 643: "A civil conspiracy is an agreement or understanding between two or more persons to do an unlawful act, or to use unlawful means to do an act which is lawful. Shaltupsky v. Brown Shoe Co., 350 Mo. 831, 168 S.W.2d 1083; Seegers v. Marx & Haas Clothing Co., 334 Mo. 632, 66 S.W. 2d 526. Strictly speaking, there has been no distinct form of writ or action of conspiracy; but the action sounds in tort, and is of the nature of an action on the case upon the wrong done under the conspiracy alleged. 11 Am.Jur., Conspiracy, § 53, p. 584; 15 C.J.S. Conspiracy § 21, pp. 1031–1033. The gist of the action is not the conspiracy, but the wrong done by acts in furtherance of the conspiracy or concerted design resulting in damage to plaintiff. Shaltupsky v. Brown Shoe Co., supra; Medich v. Stippec, 335 Mo. 796, 73 S.W. 2d 998; Seegers v. Marx & Haas Clothing Co., supra; Kansas City v. Rathford, 353 Mo. 1130, 186 S.W.2d 570. A combination for the purpose of causing a breach of contract has been held to be an unlawful conspiracy. A person who by conspiring with another or by collusive agreement with him assists him to violate his contract with a third person and to obtain the benefit of that contract for himself commits an actionable wrong."

As stated in the Rosen case, supra, conspiracy does not ordinarily give rise to a civil action unless something is done pursuant to it, which without the conspiracy, would create a right of action against the defendants generally. In the case before us it is the fraud that occurred. Fraud was practiced upon the plaintiff to its damage. And it is the general rule that punitive damages are recoverable in any action of tort involving the commission of fraud. 15 Am.Jur., Damages, Sec. 272, page 708. Thus, although it is the general rule that damages for breach of contract are limited to the pecuniary loss sustained, where the breach is occasioned by and but a part of an executed conspiracy to defraud and the action sued on is for the

tort—the fraud committed, exemplary damages may ensue. See, Hart v. Midkiff, Mo., 321 S.W.2d 500, 508(13); 25 C.J.S. Damages § 120, p. 716; Prosser, Law of Torts, 2nd Ed., Chapter 22, pp. 744–745; Louis Schlesinger Co. v. Rice, 4 N.J. 169, 72 A.2d 197. We rule the action before us is one of conspiracy to defraud, essentially sounding in tort, and as such may carry with it the assessment of punitive damages.

The remaining reasons defendants give in support of their contention that punitive damages do not lie go in the main to the question of whether a submissible case of conspiracy to defraud was made. Most of these were treated in our earlier opinion, Byers Bros. Real Estate & Insurance Agency, Inc. v. Campbell, Mo. App., 329 S.W.2d 393. Since the facts presented on the second trial are substantially the same as those on the first trial, what we there said became the law of the case. The evidence is sufficient to make a submissible case of conspiracy to defraud. It is of no avail to now argue the jury should have come to a different conclusion where the evidence, as here, viewed in its light most favorable to plaintiff, together with the permissible inferences therefrom, supports the verdict. This is especially true of defendants' contention that there is no evidence to show they did anything to prevent a sale to a prospective purchaser who was ready, able and willing to purchase according to the contract terms. Twice defendants stated their terms to Mr. Waters but upon his agreeing to them the defendants made additional requirements.

Nor is there merit to defendants' contention that in submitting its Instruction 4A instructing the jury the actual damages were $100.00 any admission by plaintiff that its action was for breach of contract. According to plaintiff's evidence it was defrauded of its $400.00 commission and other defendants settled their liability by paying $300.00. The instructions, including No. 4A, were drawn on the tort theory of a conspiracy to defraud which was accomplished.

Defendants also charge error in the giving of Instruction No. 1 for the reason the instruction required, among numerous others, the jury to find 2(a) "Brownings avoided the telephone calls of plaintiff's salesman King, if so," 2(b) "Brownings avoided an appointment with King and Waters at plaintiff's office" and 2(c) "that in furtherance of said conspiracy, if so, Brownings discouraged a sale to the Waters by advising them of a leak in the roof" when there was no evidence to support such findings.

Plaintiff's Instruction No. 1 required in the conjunctive the finding of many facts supportive of its charge of conspiracy to defraud. One portion read " * * * and that in furtherance of said conspiracy, if any, you find the Brownings first agreed to a sale to the Waters but then refused to consummate such a sale, if so, and that in furtherance of said conspiracy, if so, Brownings discouraged a sale to the Waters by advising them of a leak in the roof, if so, and if you further find plaintiff to have been defrauded of a sales commission and thereby damaged, if you so find. * * " The circumstances under which the Waters were told of a leak in the roof so large they had to catch the water "in buckets" considered with the evidence that the Brownings had not told King of a leak prior to that time, and King did not see a leak, provide a sufficient evidential basis for a finding that the motive of the Brownings in telling of the leak in the manner and to the extent they did was to discourage a sale to the Waters. Fraud and fraudulent motive are sometimes difficult to prove for fraud is seldom perpetrated openly or disclosed to witnesses. Frequently the proof, of necessity, consists of circumstantial evidence and the reasonable inferences therefrom. The evidence and its reasonable inferences amply supported this submission.

Considering 2(b), there was evidence that King, plaintiff's agent, had arranged for the Brownings to meet with him and Mr. Waters at King's office. King and Waters waited 30 minutes beyond the appointment time, and then Mr. Browning called and said he couldn't make it. Defendants argue this is not evidence "Browning avoided an appointment with King and Waters at plaintiff's office." This evidence combined with the evidence that defendant Campbell had instructed Browning to show the house as little as possible, and, the other mentioned evidence of conspiracy provides a sufficient basis for the submission of the questioned item. Plaintiff was entitled to submit its instructions not only on the direct evidence but also on the reasonable inferences that it might bear.

 As to Point 2(a), it is true that when Mr. Browning was asked, "Q. Did you try to avoid their telephone calls and their contacts?" he answered, "No, we were there all the time." However, in view of other evidence the jury may not have believed Mr. Browning's answer. The evidence was that plaintiff's salesman King tried many times "to contact" Browning after April 16, 1957, but found it "hard to do". It was a week after King had arrangements to show Mr. Waters the house that he could contact Mr. Browning. The questioned finding was perhaps a possible inference from the facts. Certainly it was sufficient to premise a finding Browning tried to avoid "their contacts". Whether such avoidance includes telephone calls is an incidental matter, surplusage and not a finding concerning an essential fact. It was just one item of many submitted in the conjunctive. Assuming there is no direct evidence to support that single item we cannot fairly say its conjunctive submission constituted such error as to necessitate a reversal of the case. While it is well-settled law that it is error to give an instruction which has no evidence to support it, not all errors are prejudicial so as to require a reversal. Cf. Wolf v. Kansas City Tire & Service Co., Mo.App., 257 S.W.2d 408, 414(12). Looking to the entire instruction, as we must, we are convinced that the error was not prejudicial to defendant, but, rather, if anything, unnecessarily added to plaintiff's burden.

Defendants' final contention is that the trial court erred in giving plaintiff's Instruction No. 2, the punitive damage instruction, because (1) it directs the jury "if you find from the evidence that the acts and things done by the defendants were willfully and maliciously done" without hypothesizing such acts and things or referring to other instructions that hypothesized them; and (2) it fails to tell the jury the assessment of punitive damages is discretionary.

 Defendants cite Luikart v. Miller, Mo.Sup., 48 S.W.2d 867, 871, where the court in discussing a punitive damage instruction worded differently from that before us stated, "The jury should have been instructed as to what 'act and representations in question' which they might find were willful and malicious would authorize punitive damages." We agree that this is the rule. The instructions when read as a whole must clearly instruct the jury on that subject and not give the jury a roving commission to guess what acts or things are meant. While Instruction No. 2 does not within itself hypothesize the acts and things referred to, they were set out in detail in the conjunctive in Instruction No. 1, which closed by directing the jury that if it found them from the evidence "your verdict should be for the plaintiff against both defendants". The first sentence of Instruction No. 2, stated, "The court instructs the jury that if you find for the plaintiff, and if you further find from the evidence that the acts and things done by the defendants were willfully and maliciously done, then, in addition to the actual damages, you may assess against the defendants by way of punishment for such wrongful acts exemplary or punitive damages. * * *" It is fundamental that the instructions must be read

as a whole. If when read as a whole the instructions are sufficient to make it clear to the jury what is intended by the submission there can be no merit to the contention that an instruction which did not repeat that which was properly submitted in another instruction is reversibly erroneous. In Hall v. Martindale, Mo.App., 166 S.W. 2d 594, 604, in disposing of a contention similar to the one before us the court stated: "* * * even though one particular instruction might be looked upon as incomplete if read without regard to the other given instructions, it nevertheless suffices if its partial view is supplemented by the other instructions so that the whole are consistent and harmonious." We believe the jury, as reasonable men, understood the acts and things referred to were those detailed in the conjunctive in Instruction No. 1, which the jury was required to find before it could consider any damages under Instruction No. 2. Additionally, Instruction No. 1 itself required a finding that each act of defendant Campbell submitted in the instruction was committed with the intent to defraud plaintiff. Under these circumstances, we find no reversible error. However, the instruction is no model for future use and the problem presented here should not recur. See, Pogue v. Rosegrant, Mo.Sup., 98 S.W.2d 528, 533; Hart v. Midkiff, supra, 321 S.W. 2d p. 509.

Finally, we rule Instruction No. 2 in using the word "may" did advise the jury that any allowance of punitive damages was discretionary with the jury, and that it did not have to grant punitive damages. An accepted dictionary definition of "may" is "permission". Permission to do a thing is not a requirement or order that it be done. In State ex rel. Kennen v. Fidelity & Deposit Co., 94 Mo.App. 184, 67 S.W. 958, 963, the court discussed an instruction on permissive interest. The instruction provided, "* * * to which you may add 6% interest * * *." The court ruled "But it did in fact leave the allowance of interest to the discretion of the jury, and, if the defendants were not satisfied with the instruction, they should have asked for a more definite direction." Cf. Dickensheet v. Chouteau Mining Co., 200 Mo.App. 150, 202 S.W. 624. We find no merit in defendants' final contention.

The judgment is affirmed.

All concur.