**CHRYSLER INTERNATIONAL CORPORATION, Plaintiff–Appellee,**

v.

**CHEROKEE EXPORT COMPANY, Defendant–Appellant.**

No. 96–1747.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 24, 1997.

Decided Jan. 14, 1998.

Rehearing Denied Jan. 30, 1998.

Thomas J. Tallerico (argued and briefed), Todd M. Stenerson (briefed), Howard & Howard, Bloomfield Hills, MI, Mark F. Kennedy, Parcel, Mauro, Hultin & Spaanstra, Denver, CO, Allan M. Huss (briefed), Chrysler World Headquarters, Office of the General Counsel, Auburn Hills, MI, for Plaintiff–Appellee.

Christopher D. Kuebler, O'Bryan Law Center, Birmingham, MI, Stanley Morganstern (argued and briefed), Christopher M. DeVito (briefed), Timothy L. McGarry (briefed), Morganstern, MacAdams & DeVito Company, Cleveland, OH, for Defendant–Appellant.

## OPINION

WELLFORD, Circuit Judge.

Plaintiff Chrysler International Corporation ("Chrysler") acquired the Jeep line of vehicles when it purchased American Motors Corporation ("AMC") in 1987. Thereafter it began selling Jeeps to defendant Cherokee Export Company ("CEC"), a Florida corporation. In 1989, the parties formalized their relationship in a special export sales agreement. This litigation arose from Chrysler's attempts to collect amounts due under a subsequent version of that agreement. CEC counterclaimed seeking damages under several theories and an injunction against Chrysler, but it subsequently waived its fraud claim and its request for injunctive relief.

CEC now appeals the district court's grant of summary judgment and attorney's fees to Chrysler. The district court found that CEC had committed a first substantial breach of its agreement with Chrysler and that it had no rights under (1) the Automobile Dealer Day in Court Act, (2) the Florida Motor Vehicle Act, or (3) the Florida Automobile Franchise Act. The district court accordingly granted summary judgment in favor of Chrysler on all of its claims and against CEC on its remaining counterclaims.

The parties essentially renewed the terms of their 1989 agreement by a second special export sales agreement in 1993. That agreement, which governs the dispute in this litigation, expired, by its terms, on July 31, 1995.

Under the 1993 agreement, CEC had the nonexclusive right to purchase vehicles from Chrysler for export and resale to customers in certain countries listed in the agreement. The agreement excluded any other countries from CEC's sales area, including the United States. In addition, CEC was barred by the terms of its agreement from selling vehicles to any individual or entity for resale. At no time relevant to this litigation did CEC apply for or obtain a Florida license as a franchised motor vehicle dealer. Moreover, the agreement did not give CEC the right to sell vehicles domestically.

Chrysler was essentially using CEC to establish a "foothold" in the specified export markets. Its stated goal was eventually to create a worldwide network of distributors. Once the Chrysler brand name and Chrysler dealerships had been established in a particular export market, CEC would be precluded

from continuing to export vehicles to that country. Chrysler accordingly reserved the right to delete countries from CEC's approved list on thirty days notice. CEC was to pay Chrysler for the vehicles immediately on delivery, secured by means of an irrevocable letter of credit. Chrysler frequently extended the payment terms to CEC, however, once giving CEC 180 days from delivery to pay.

It is undisputed that CEC made numerous out-of-area sales, in violation of the 1993 agreement. On several occasions, moreover, CEC created "strawman" documentation making it appear as if it had "sold" vehicles to First Imperial, a company in the Netherlands Antilles, a "permitted" country, when in fact the sale was to Pexi, Inc., a Florida corporation, and thus forbidden under the agreement's prohibition of sales within the United States.[1] Although Chrysler admits knowledge of some of CEC's out-of-area sales, Chrysler did not know about the "strawman" sales until discovery in this litigation.

The parties differ on the legal significance of CEC's behavior. CEC argues that Chrysler in fact encouraged CEC's out-of-area sales, contending that Chrysler's main interest was selling cars, and that out-of-area sales resulted in only "a slap on the wrist." Chrysler maintains, on the other hand, that it was concerned about CEC's out-of-area sales and always considered and treated them as violations of the 1993 agreement. Chrysler sent several letters to CEC's president, Mr. del Marmol, asking CEC to stop making out-of-area sales and to abide by the 1993 agreement.

During the parties' business relationship, most of the vehicles CEC purchased from Chrysler were made in the United States. CEC, however, also purchased vehicles assembled by the Beijing Jeep Corporation ("BJC"). In 1992, CEC and Chrysler entered into a separate one-year sales distributor agreement, which was subsequently extended for a year, with BJC. Under that distributor agreement, BJC would sell vehi-cles to Chrysler and Chrysler would deliver them to CEC in Tanzania, Africa. Pursuant to this agreement, Chrysler arranged for two shipments of a total of 150 BJC-produced right-hand-drive Jeeps, the last shipment of 100 occurring in July 1994.

Disagreements arising from these shipments form a principal basis of this litigation. CEC alleges that both shipments of the BJC vehicles were in poor condition, needing extensive repairs before they were saleable. The 100 vehicles in the second shipment, CEC claims, were so bad it had to transport them for reconditioning from Tanzania to South Africa, where American Car Sales ("ACS"), a South African company, allegedly repaired and sold the vehicles for CEC on a consignment basis. CEC alleges that it paid $750,000 in transportation costs to get the 100 vehicles from Tanzania to South Africa, and that it incurred further losses when 20 of the vehicles had to be "cannibalized" for their parts. CEC asserts that Chrysler should have reimbursed the money it had to pay for transportation costs and for the lost sales from the 20 cannibalized vehicles. Chrysler asserts that it offered to buy the vehicles from CEC at their purchase price, but CEC rejected Chrysler's offer.

At this point in the recounting of their business relationship, the parties' versions of the facts differ dramatically. The district court found that by October 1994, CEC's total exposure in accounts payable to Chrysler exceeded $5.5 million. Chrysler therefore asked CEC to pay down its obligation and to double its $750,000 letter of credit, which was due to expire in February 1995. Chrysler took this action, it claims, because of its concern over the cumulative level of CEC's exposure, the unusually long payment terms of the Tanzania sales (90–180 days), and CEC's out-of-area sales. CEC, on the other hand, asserts that in 1994 Chrysler unilaterally decided to terminate its agreement with CEC and failed to give the required written notice of its decision. Instead, it accomplished the termination by placing CEC on finance hold, canceling pend-

---

1. CEC's president, Mr. del Marmol, admitted in his deposition that CEC undertook this practice to "circumvent selling to the State of Florida because we couldn't sell to the State of Florida. It's just one more of the things that people in business do."

ing orders, and stopping production on other orders. CEC claims that Chrysler's actions caused it to breach agreements with its consumers and forced it to refund deposits, thereby drying up CEC's cash flow. CEC asserts, furthermore, that it had achieved a credit balance with Chrysler as of September 30, 1994, by making payments before they were due in an attempt to maintain the ongoing relationship.

Both sides agree that in January of 1995, del Marmol proposed a pay-down schedule by which CEC would pay some of its debts to Chrysler while resolving other controverted amounts, and would attempt to increase and extend its line of credit. The district court found, however, that del Marmol reneged on his own proposal, as well as the original agreement. CEC made no payments to Chrysler after mid-January 1995. In addition, del Marmol did not contact SunBank, the institution at which CEC maintained its line of credit, about an extension of the $750,-000 line until February 23, 1995, very shortly before it was to expire.

The district court found that by mid-February 1995, CEC's indebtedness to Chrysler exceeded $3 million. Chrysler then drew on the $750,000 line of credit, leaving an indebtedness in excess of $2 million. CEC claims that Chrysler never responded to del Marmol's January 1995 proposal, other than to demand unconditional and immediate payment. In March, Chrysler launched this litigation, claiming breach of contract and damages, and seeking indebtedness due and a declaratory judgment.

 We review a district court's grant of summary judgment de novo. *Maddox v. Univ. of Tennessee,* 62 F.3d 843, 845 (6th Cir.1995). We examine the evidence in the light most favorable to the non-movant, searching for more than a scintilla of evidence on which a jury could reasonably find for that party. *Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994). In the absence of any demonstrated genuine issue of material fact, summary judgment is appropriate. *Id.*

## I. THE BREACH OF CONTRACT CLAIMS

 Each party has asserted that the other breached the 1993 agreement. CEC asserts that Chrysler breached the agreement by not filling CEC's orders after October 1994, by terminating its relationship with CEC without the required written notice, and by non-payment of certain warranty claims. Chrysler claims that CEC breached the agreement by selling out-of-area, by selling to resellers, and by not paying at all for the BJC vehicles. Both may be correct in their allegations of breach against the other. The substantial contested issue is whether a party's breach now precludes it from asserting rights under the contract. Michigan law is settled: " 'He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform.' " *Ehlinger v. Bodi Lake Lumber Co.,* 324 Mich. 77, 36 N.W.2d 311, 316 (1949), *quoting Jones v. Berkey,* 181 Mich. 472, 148 N.W. 375, 378 (1914). The determining factor in Michigan breach of contract cases and in this case is therefore whether a first breach is "substantial." The Michigan Supreme Court has explained that a "substantial breach" is one "where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party." *McCarty v. Mercury Metalcraft Co.,* 372 Mich. 567, 127 N.W.2d 340, 343 (1964).

Michigan case law indicates that the determination of which breaches are "substantial" is inextricably tied to the particular facts of the case. Therefore, similar behavior may or may not constitute a substantial breach, depending on the factual background. *Compare Ehlinger,* 36 N.W.2d at 316 (finding a substantial breach where the plaintiff breached its contractual duty to pay wages to sawmill workers and to pile lumber as directed by the defendant lumber company) *with Baith v. Knapp–Stiles, Inc.,* 380 Mich. 119, 156 N.W.2d 575, 579 (1968) (finding that the plaintiff's breach in not meeting the payroll merely violated an "oral agreement in regard to accounting" and did not affect so essential an element of the contract as to qualify as a

substantial breach). *See also McCarty*, 127 N.W.2d at 343 (holding that the plaintiff's immediate termination of a sales contract, in violation of the contract provision requiring 60 days' notice, was not a substantial breach barring plaintiff's suit seeking unpaid commissions); *Michaels v. Amway Corp.*, 206 Mich.App. 644, 522 N.W.2d 703, 707 (1994) (finding no substantial breach where the plaintiff sold a prohibited product and failed to hold weekly sales meetings as required by the distributorship agreement). *Cf. Flamm v. Scherer*, 40 Mich.App. 1, 198 N.W.2d 702, 706 (1972) (considering plaintiff's failure to deliver the proper strain of pickling cucumber seed a substantial breach precluding his suit against the defendant for selling all his pickles to another buyer).

Under the factual record in this case, we are satisfied that there is no question that CEC's frequent out-of-area sales constitute a first *substantial* breach. The essential purpose of the contract between CEC and Chrysler was to establish the Chrysler brand in developing markets. CEC was specifically precluded from making sales in unauthorized areas because Chrysler wanted to reserve those markets for authorized Chrysler dealerships. CEC knew this was Chrysler's purpose. Yet CEC often violated this term of the agreement. Heinz Ahrens, an official at Pexi, Inc., testified in his deposition that during his six years with the company, he had purchased "at least a hundred if not two hundred" vehicles from CEC, contrary to agreement terms. Many of these sales, it turns out, were "strawman" sales accomplished with bogus paperwork. CEC has no real defense for this behavior, a material breach as a matter of law. We therefore find CEC is precluded under Michigan law from asserting rights under the contract.

■ Since this case is before us in the posture of an appeal from summary judgment, we consider CEC's contentions concerning this issue. First, CEC argues that the question of a substantial breach is one for the trier of fact. Second, CEC claims that Chrysler waived the agreement's territorial limitations by sending implicit messages that the paramount goal was to sell more cars.

CEC argues that the question of Chrysler's waiver is also one for the trier of fact.

The district court, however, found that CEC materially breached the agreement before any of the disputes forming the basis for this litigation, i.e., those surrounding the delivery of the BJC Jeeps or the extension of credit, arose. Therefore, the district court held that CEC may not assert rights under the contract in connection with those disputes. As our analysis above suggests, this basis for the district court's decision is legally sound. Additionally, we agree that Chrysler's numerous warnings to CEC do not constitute a waiver of rights as a matter of law.

## II. CLAIMS UNDER THE FEDERAL AUTOMOBILE DEALER DAY IN COURT ACT, THE FLORIDA MOTOR VEHICLE DEALER ACT, AND THE FLORIDA AUTOMOBILE FRANCHISE ACT

■ CEC argues it is entitled to the protections afforded motor vehicle dealers under the federal Automobile Dealer Day in Court Act ("ADDCA"), 15 U.S.C. § 1221 *et seq.*, the Florida Motor Vehicle Dealer Act ("FMVDA"), Fla. Stat. § 320.27, and the Florida Automobile Franchise Act ("FAFA"), Fla. Stat. § 320.60 *et seq.* The district court held, and Chrysler now asserts, that CEC has no rights under those statutes since the Agreement between the parties contained a specific waiver provision. The relevant contract language reads:

> Chrysler and Exporter expressly understand and agree that Exporter is *not a new motor vehicle dealer*, as that term or any term of similar import is defined or used in the Automobile Dealer Day in Court Act, ... the Florida Motor Vehicle Dealer Act, ... or the Florida Automobile Franchise Act, ... and *the execution of this Agreement creates no rights in either party under any of those statutes.*

(emphasis added). We affirm the district court's holding that CEC has no rights under the statutes in question, but we do not believe the issue should be considered one of traditional waiver. Instead, we affirm the district court because we believe that, under the circumstances presented in this case, it

was highly unlikely or very doubtful that any of these statutes would apply to the parties. In such circumstances, the parties were free to bargain over the issue, and to include in their Agreement a statement that the acts did not apply to their relationship. Having signed the Agreement containing such a clause, CEC cannot now assert rights under those statutes.

Quite simply, CEC is not the sort of entity the federal and Florida motor vehicle dealer statutes were designed to protect. The intent of the statutory scheme is to protect local dealerships, typically owned by small businessmen whose relative economic power places them at a disadvantage in dealing with national manufacturers. *See, e.g.,* H.R.Rep. No. 2850, at 2 (1956), *reprinted in* 1956 U.S.C.C.A.N. 4596, 4597 (indicating that the federal statute's protection of "dealers" was meant to reach the "small-business man whose relative size makes it impossible to bargain effectively"). These statutes accomplish this goal, in the case of the federal act, by preserving the local dealer's right to a judicial determination of whether the manufacturer has acted in good faith and compliance with the terms of the franchise agreement, 15 U.S.C. § 1222, and in the case of the Florida statutes, by attempting to prevent manufacturers from extorting disproportionately burdensome and unfair promises from local automobile dealers, Fla. Stat. § 320.63(3); *id.* § 320.64.

We are persuaded that these laws were not intended to protect companies like CEC, an exporter. *See* 15 U.S.C. § 1221(c) (defining "automobile dealer"); Fla. Stat. § 320.27(1)(c) (defining "motor vehicle dealer"); *id.* § 320.60(11) (same); *see also* H.R.Rep. No. 2850, at 2 (1956), *reprinted in* 1956 U.S.C.C.A.N. 4596, 4597; *State v. British Leyland Motors, Inc.,* 290 So.2d 576, 579–80 (Fla.Dist.Ct.App.1974) (holding that "[t]he statutory definition of 'motor vehicle dealer' ... is not clear and unambiguous when considered in connection with other portions of the statute," and concluding that if it is unclear that a particular agreement would fall under the provisions of § 320, the right to contract must be protected "unless clearly restricted by a valid law"); *Aero Products Corp. v. Department of Highway Safety and Motor Vehicles,* 675 So.2d 661, 664 (Fla.Dist. Ct.App.1996) ("Any doubt as to whether a distributorship agreement is governed by the franchised dealer law should be resolved in favor of the right to freely contract."). CEC was a sophisticated commercial entity, and it negotiated its Agreement with Chrysler at arm's length. CEC's business was based on the exploration and development of international export markets. Significantly, CEC was expressly prohibited from making sales in the United States, or in any other country where Chrysler distributorships were already in operation. CEC's relative bargaining position was both stronger than, and qualitatively different from, that of the typical local dealership, whose services to Chrysler are more easily replaced. In addition, CEC neither applied for nor received a franchised motor vehicle dealer license in the state of Florida, as required by Fla. Stat. § 320.27(2).

Under the circumstances recounted here, we doubt the statutes' applicability to CEC; the parties were free to bargain and reach an agreement to that effect. Therefore, CEC cannot assert rights under the ADDCA, the FMVDA, and the FAFA. We **AFFIRM** the district court's holding with respect to these claims.

### III. THE LENDER LIABILITY COUNTERCLAIM

██ The district court denied CEC's lender liability counterclaim, finding no wrongful conduct by Chrysler on which to base the claim. We agree with this finding, as Chrysler did nothing more by its conduct in this case than assert its contractual rights. The district court also properly noted that Chrysler was not CEC's lender in any sense that could create a fiduciary relationship between the two parties. The district court characterized the relationship between Chrysler and CEC as an "arms-length business transaction." We agree with this assessment. Finally, even if the relationship between Chrysler and CEC were analogous to lender and borrower, Chrysler would be entitled to assert its contractual rights. *Van Arnem Co. v. Manufacturers Hanover Leasing Corp.,* 776 F.Supp. 1220, 1222 (E.D.Mich.1991).

To the extent that this counterclaim may be construed as an action for breach of an implied contractual obligation to act in good faith, we similarly affirm the district court. The agreement at issue in this case is governed by Michigan law as provided in the agreement. Michigan recognizes no independent tort action for the alleged breach of a contract's implied covenant of good faith and fair dealing. *Ulrich v. Federal Land Bank of St. Paul,* 192 Mich.App. 194, 480 N.W.2d 910, 911 (1991).

Therefore, whether this claim is construed as lender liability or breach of good faith and fair dealing, it must fail as a matter of law. The district court's grant of summary judgment was not in error.

## IV. THE TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS CLAIM

To make out a claim for tortious interference with business relations, a Michigan plaintiff "must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Feldman v. Green,* 138 Mich.App. 360, 360 N.W.2d 881, 886 (1985). " 'Malice' in the legal sense is the intentional doing of a wrongful act without justification or excuse. And a 'wrongful' act is any act which in the ordinary course will infringe upon the rights of another to his damage, except it be done in the exercise of an equal or superior right." *Id.* at n. 1, *quoting Louis Schlesinger Co. v. Rice,* 4 N.J. 169, 72 A.2d 197, 203 (1950). Chrysler here has committed no act which would fit within the requirements of a prima facie case of tortious interference.

## V. THE GRANT OF ATTORNEY'S FEES

The district court awarded attorney's fees to Chrysler in the amount of $276,-787.03. This court reviews a grant of attorney's fees for abuse of discretion. *Brown v. Local 58,* 76 F.3d 762, 771 (6th Cir.1996).

The district court's award of fees was appropriate pursuant to paragraph 12 of the Agreement, which states that Chrysler is entitled to reimbursement for "all expenses incurred ... in connection with (a) the collection of any amounts due from Exporter (including, but not limited to, exchange losses, bank charges, court costs and attorney's fees).... " Chrysler initiated this litigation to recover amounts CEC owed under the terms of the agreement. In order to obtain a judgment, Chrysler was obliged to defend the multiple-count counterclaim asserted by CEC. CEC objects to the award of fees on the ground that this litigation was only partly a collection action, and on the ground that the unilateral fee-award clause was unconscionable under Michigan law. We find CEC's objections to the fee award meritless. Judge Rosen did not abuse his discretion in awarding Chrysler attorney's fees in the amount specified.

For the reasons set forth above, we **AFFIRM** the district court in all respects.