HENRY H. GROSSMAN, RESPONDENT, v. CALONIA LAND AND IMPROVEMENT COMPANY, APPELLANT.

Submitted May 28, 1926—Decided October 18, 1926.

1. A paper-writing, addressed to a mortgage loan broker and signed and delivered to him by his customer, requesting the procurement of a loan and promising a fee in case of success, is unilateral until accepted by the broker ; but such acceptance takes place,

and the contract becomes complete, when the broker undertakes the task of procuring the loan and takes steps by way of accomplishing that end.

2. The act of 1902 (*Pamph. L., p.* 459; *Comp. Stat., p.* 5706, *pl.* 7), providing that a corporation cannot set up the defense of usury, is not applicable to section 5 of "An act against usury" (*Comp. Stat., p.* 5706), relating to fees for procuring loans of money.

3. A contract originally void because of statutory inhibition is not validated by the later repeal of the statute.

On appeal from the Supreme Court.

For the appellant, *Roy F. Dunn* and *Irving W. Teeple.*

For the respondent, *Jacob L. Newman.*

The opinion of the court was delivered by

PARKER, J. The suit is to recover the sum of $6,000 and interest claimed by the plaintiff, a loan broker, as agreed compensation for negotiating a mortgage loan of $70,000 on property of the defendant corporation, pursuant to a written paper signed and delivered by defendant. One of the defenses was that the contract, if any, was illegal and void as providing for a rate of brocage in excess of that permitted by the fifth section of the statute entitled "An act against usury" (*Comp. Stat., p.* 5706), which prescribes a penalty for "taking or receiving" more than fifty cents per hundred dollars of loan per year, *i. e.,* one-half of one per cent. per year. The statute is an ancient one (*Pat. L.* 226; *Allison* 111), dating back as far as 1738. To this defense two replies were made; the first, that since the act of 1902 (*Pamph. L., p.* 459; *Comp. Stat., p.* 5706, *pl.* 7), a corporation cannot set up such a defense; the second, that section 5 was repealed on March 12th, 1925 (*Pamph. L.* 1925, *p.* 182), in time to validate the contract sued on. The trial court took this latter view, denied a nonsuit and charged the jury that "when the offer was accepted by the plaintiff there was no illegality about it." The case comes before us on exceptions to these rulings.

The charge of the court and the views expressed on the motion to nonsuit, so far as concerns the making of a con-

tract, amount in substance to this, that the arrangement between the plaintiff and defendant was not a complete contract until after the repealer statute had taken effect.

If the contract was illegal by statute and was a complete contract before the repealer was in force, it was simply void as a basis of recovery; *Gregory* ads. *Wilson*, 36 *N. J. L.* 315; and no legal vitality could be imparted to it by a later repeal of the statute that had deprived it of validity. 6 *R. C. L.* 706; 36 *Cyc.* 1224, *note* 87; *Springfield Bank* v. *Merrick*, 14 *Mass.* 322; *Vaughan* v. *Hankinson's Adm'r*, 35 *N. J. L.* 79, 82. We, therefore, proceed to the question whether the trial court was correct in holding that the contract was not "accepted," *i. e.*, complete, before the repealer.

The circumstances are not in dispute. Under date of February 11th the defendant corporation, by its president, executed a paper-writing of which the parts material to the case are as follows:

"The undersigned wishes to procure a loan of $70,000 at 6 per cent. interest per annum, for          years, on the bond of the owner, Calonia Land and Improvement Co., secured by a first mortgage on the following property: [Here follow details describing the security offered; the paper then proceeds as follows:]

"Newark, N. J., Feb. 11, 1925.

"*   *   *   the undersigned, do hereby authorize Henry H. Grossman to secure a loan of $70,000, or any amount that I may accept on the above-described property, and promise and agree to pay the said Henry H. Grossman the sum of $6,000 to cover all expenses for services rendered should he succeed in having said loan granted.

"Calonia Land and Improvement Co.,
"Ellen Crowley, *Pres.*"

Upon receiving this paper the plaintiff immediately went to work to secure the loan, engaged others in the same line of business to assist, and, through the efforts of one of them, a loan of the required amount was granted by a financial institution, to run one year. This was reported to defendant, who refused to accept a loan for one year, so the plain-

tiff renewed his efforts, and on March 13th, 1925, a day after the repealer took effect, the same institution notified defendant by letter that two years would be satisfactory, and defendant accepted that loan.

The theory of the trial court, if we read the case correctly, was that the contract to pay $6,000 was not complete until plaintiff "accepted" it by producing the desired loan. But we are unable to take that view of the matter. It is of course true that in order to be entitled to the money plaintiff must needs procure a loan conformably to the terms of the writing; but that is a very different thing from saying that no contract was in existence until the loan was forthcoming. If A employ B to build a house, promising a stated sum upon completion, B is not entitled to the money until the house is built; but a contract has been in force from the time that B assented and agreed to do the work. It is doubtless true that in most cases a broker incurs no absolute obligation to make a sale of real estate, or procure a loan, or sell stock, or obtain insurance; in other words he does not guarantee success. And unless he undertakes the employment in question, such a paper as that before us is a mere *nudum pactum. Schoenmann* v. *Whitt,* 136 *Wis.* 332; 117 *N. W. Rep.* 851. But if on the other hand he does undertake it and goes to work accordingly a contract is born, containing, in the language of the cited case, "the implied obligation to use ordinary diligence in endeavoring" to accomplish the result contemplated in the writing of employment. So, in *Lapham* v. *Flint,* 86 *Minn.* 376; 90 *N. W. Rep.* 780, the court said: "Conceding that the contract on its face is unilateral * * * if in fact the agent proceeded in good faith to carry out the terms of the agreement, advertised the property, and endeavored to procure a purchaser for it according to the written terms, that would constitute an acceptance." Similar reasoning will be found in *Goward* v. *Waters,* 98 *Mass.* 596. An illuminating case is *Mooney* v. *Daily News Co.,* 116 *Minn.* 212; 133 *N. W. Rep.* 573. Defendant offered a prize to the person procuring the largest number of new cash subscriptions, subject to certain pub-

lished rules.  A number of persons entered the contest, including the plaintiff, who secured subscriptions and sent them in, and claimed the prize.  His claim was disallowed because he had failed to comply with some rule promulgated after his entry, but to which he had not assented.  The court said: "The defendant company, after making and publishing the rules governing its so-called contest, was bound thereby as to the contestants who sent in subscription remittances in accordance therewith.  After a contract was thus made between the defendant and the individual contestants, including the plaintiff, the defendant could not change the rights of the contestants thereunder through its misinterpretation of the rules as published, nor did it have the right to change or give to the rules its own interpretation."

The newspaper case is instructive in that there was no exclusiveness of employment, as in many of the brokerage cases.  But the element of exclusiveness is merely an element in a contract, and not determinative of its existence.  Thus, in *Vreeland* v. *Vetterlein,* 33 *N. J. L.* 247, Chief Justice Beasley discussed the relative rights and obligations of brokers and their employers in cases where several brokers are openly employed, and laid it down as a duty of the employer to remain neutral between them.  If such a duty exists it must necessarily arise out of a contractual relation.

We conclude, therefore, that when the paper-writing was delivered to and accepted by plaintiff and he undertook the employment and proceeded to take the measures usual with brokers to procure the loan on the terms stated, a contract came into being, the obligations whereof were, in substance, on the part of plaintiff to use reasonable care, diligence and skill in endavoring to procure the loan to the amount and on the terms stated; on the part of the defendant, to abstain from any unlawful interference with plaintiff in the execution of the commission and to pay the stipulated fee in case of success.  The error of the trial judge consisted in identifying the actual procurement of the loan with the undertaking to use the reasonable effort of the broker in so doing; or to put it in another way, in holding that no contract

existed until the stipulated fee had been earned. If this were so, it would not have been held, as it was held, in *Milliken* v. *Woodward,* 64 *N. J. L.* 444, that a broker employed to procure insurance is liable for negligence whereby invalid policies were accepted.

It follows, therefore, that a contract of employment between broker and principal existed prior to the Repealer act taking effect, and the trial judge intimated, and as we think correctly, that such a contract was void by the fifth section of the so-called "Usury" act. It is argued that in any event the defendant, a corporation, cannot avail itself of this defense because of the act of 1902 (*Pamph. L., p.* 459; *Comp. Stat., p.* 5706), providing that "no corporation shall hereafter plead or set up the defense of usury to any action brought against it to recover damages or enforce a remedy on any obligation executed by said corporation." * * * This raises the question, never determined heretofore in this court, whether this illegal brocage denounced in the fifth section of the "act against usury" is within the contemplation of the act of 1902. The Supreme Court, in a case directly in point, held in 1910 that it was not. *Mazarin* v. *Hudson County R. E. & B. Co.,* 80 *N. J. L.* 35; and five years earlier, Mr. Justice Reed, speaking for this court in *Lembeck* v. *Jarvis Co.,* 70 *N. J. Eq.* 757 (at *p.* 761), remarked: "It is obvious, however, that the statute was passed to protect those that had made loans of money and had taken the paper or bonds of a corporation." We passed the point in *Orsiovitch* v. *Federal Tool and Manufacturing Co.,* 94 *Id.* 744, the question considered and decided in that case being whether a chattel mortgage containing an agreement to pay the principal of a debt with interest at more than the fixed legal rate, was an "obligation executed" within the intendment of the act of 1902.

The matter being now fairly presented, we hold that the word "usury" in the act of 1902 should have its usual and ordinary meaning, viz.: "an unconscionable or exorbitant rate or amount of interest" (*Webs. Internat. Dic., tit.* "*Usury*") ; contracting for or reserving something in excess of

the amount allowed by law for the loan or forbearance of money.    40 *Cyc.* 888.    Consequently the defense of illegality of contract was open to the defendant, the contract of employment having been complete before the repealer, and that act being ineffective to validate a contract previously voided by law.    It was therefore error to hold that the contract was not complete until after the repealer took effect, and for this error the judgment must be reversed.

It is suggested in the brief for respondent that section 5 is not applicable because the stipulated fee of $6,000 for procuring a loan of $70,000 includes "all expenses."    But we see nothing in this.    On a two-year basis the lawful limit of brocage would be $700, and it is idle to suppose that the incidental expenses, even if properly exclusive of the fee, as to which we express no opinion, would total up anything like $5,300.    In fact it appears by testimony adduced for the plaintiff that he farmed out his contract of employment to another broker for one-half the stipulated fee, such one-half to cover all expenses, thus leaving $3,000 clear to the plaintiff.

The judgment will be reversed to the end that a *venire de novo* issue.

*For affirmance*—None.

*For reversal*—THE CHIEF JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, JJ.    15.