120 N.J. Super. 85 (1971)
293 A.2d 408
ASSOCIATION GROUP LIFE, INC., A CORPORATION, PLAINTIFF-APPELLANT
v.
CATHOLIC WAR VETERANS OF THE UNITED STATES OF AMERICA, A CORPORATION, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 10, 1971.
Decided July 7, 1971.
*89 Before Judges CONFORD, KOLOVSKY and CARTON.
Mr. James J. Shrager argued the cause for appellant (Messrs. Hannoch, Weisman, Stern & Besser, attorneys; Mr. Albert G. Besser, of counsel).
Mr. John J. Monigan, Jr. argued the cause for respondent North American Life and Casualty Company (Messrs. Stryker, Tams & Dill, attorneys).
Mr. William M. Feinberg argued the cause for respondent Catholic War Veterans of the United States of America (Messrs. Feinberg, Dee & Feinberg, attorneys).
The opinion of the court was delivered by CONFORD, P.J.A.D.
Plaintiff Association Group Life, Inc. ("AGL") brought this action against the defendants, Catholic War Veterans of the United States of America ("CWV") and the North American Life and Casualty Company ("NAL") for breach of contract and for tortious interference with business relationships and advantageous economic position. Plaintiff appeals from the dismissal at a jury trial of the contract claims at the end of the plaintiff's case, and the dismissal of the tort claims at the close of defendants' case.
AGL is a corporation organized in 1962 for the purpose of placing group life insurance policies with veterans' or fraternal organizations. It was a two-man operation, the principals being Charles Witzburg and Albert Mehrbach, functioning from Witzburg's general insurance offices in Union, New Jersey.
In the latter part of 1962 and early 1963 AGL, through Mehrbach, interested the national officers of CWV in a program of group life insurance for its members. Thereafter it negotiated a tentative proposal by NAL to write the policy, under which AGL would receive commissions of 35% of premiums for the first year and 12 1/2% thereafter on any *90 policies written. It would solicit CWV's full membership. The proposal was approved by the CWV National Board. On March 2, 1963 the appropriate officers of CWV, pursuant to resolution of that body, wrote AGL a letter agreeing that (1) AGL was authorized to solicit its membership for NAL life insurance; (2) CWV would furnish AGL annually a list of its members; (3) it was certified that "this agreement" was duly authorized by resolution of the National Board.
AGL at once began soliciting CWV members, using a mailing list submitted by CWV and a brochure prepared by AGL and paid for by NAL. It eventually enrolled some 1700 CWV members in the insurance program. NAL and AGL entered into a written agreement effective as of July 1, 1963. Article V of the agreement, the hereafter underscored portion of which was at first objected to by AGL but insisted upon by NAL, read:
The Broker [AGL] shall be paid a commission of 20% of the premiums paid in the first twelve months period on each certificate and 7 1/2% of the premiums paid each subsequent twelve months period for each certificate. In addition the Administrator [AGL] shall receive an expense allowance of 15% of the premiums paid in the first twelve months period on each certificate and 5% of the premiums paid in each subsequent twelve months period for each certificate. In the event a new agent of record or administrator shall be appointed or recognized by the Association [CWV], thereafter the Company [NAL] shall have no further obligation to pay commissions and/or expenses to the Broker and Administrator [AGL] ... (Emphasis added.)
Under the agreement AGL was to canvass the CWV Group and distribute Certificates to insureds at its own expense and NAL was to print material for AGL for sales purposes. A master policy provided that it was to be renewed from year to year subject to the company's right to establish new premium rates for renewal periods.
Dissatisfaction with the program began to be manifested by both CWV and NAL within a year of its inception. CWV thought the promotional efforts by AGL were inadequate. *91 Near the end of 1964 NAL notified AGL it did not intend to renew the policy after July 1, 1965 because its loss experience was excessive in relation to receipts and expenses. While it wanted, as an alternative, to increase premiums, AGL persuaded it to employ the expedient of reduction of benefits instead, and CWV reluctantly agreed thereto. Thereafter CWV became increasingly dissatisfied with the reduction of the benefits and sought detailed accounting by AGL and NAL of their expenses in connection with this business. AGL pressed NAL to restore the benefits. In December 1965 the latter agreed to restore the benefits on a sliding scale roughly related to increased enrollment of CWV members in the program. AGL tried, with the acquiescence of CWV, to find another carrier which would maintain the desired scale of benefits, and it received a proposal from one company. That was rejected by CWV because of doubts as to the reliability of the proposed insurer.
At about the same time as the foregoing events CWV conceived the idea of eliminating AGL and taking over the latter's functions and compensation. It felt it could do the administrative work necessary out of its Washington headquarters. It broached the subject to NAL but stipulated that the original insurance benefits would have to be restored if NAL was to continue to underwrite the program. It also took the position that since brokerage would be eliminated under the new arrangement the amount of the administrative fees previously paid to AGL should be increased, under the new arrangement with CWV, by the amount of such brokerage fees. NAL apparently indicated tentative approval thereof.
On March 26, 1966 the CWV National Commander, Riley, wrote AGL that CWV would self-administer the program and that AGL's services as agent were terminated as of June 30, 1966. AGL remonstrated to CWV, but in vain.
To prepare for the new arrangement NAL had its Newark office manager appointed as agent of record on the CWV life insurance program. However, that individual was not *92 to be compensated and was not expected to perform any services. Internal correspondence within the NAL corporate organization indicates that the nominal broker was designated, by advice of counsel, "so as not to violate this agreement [the one with AGL]." That correspondence also stated: "Actual commissions and expense allowances are being paid to the Catholic War Veterans' organization. Thus, there has been no increase in our expense".
CWV took over responsibility for administering the program on July 1, 1966 but failed over the next few years to increase the membership in the program over that attained by AGL or substantially to reduce administrative expenses.

I.
Defendant CWV makes the preliminary point that the result below is justified, if for no other reason, on the ground that AGL had failed to secure an insurance broker's license from the State prior to solicitation of CWV's members for group life insurance. Both Mehrbach and Witzburg were licensed insurance brokers in this State; the corporation AGL was not, at any time here involved. It paid a fine for violation of the licensing act after this action began.
N.J.S.A. 17:22-6.6 and 17:22-6.9 set forth in detail the procedures an individual applicant for an insurance broker's license must follow. The two sections prescribe minimum requirements as to age, education, experience, and reputation. These provisions were originally enacted as L. 1944, c. 175. N.J.S.A. 17:22-6.9 was amended by L. 1945, c. 82, § 1, to contain the following additional language:
A license may be issued by the commissioner to and in the name of any copartnership or corporation engaged in the insurance brokerage business upon written request and payment of the $25.00 fee prescribed in section 13 of this chapter [N.J.S.A. 17:22-6.13]; provided, all members of the copartnership or all of the officers of the corporation, as the case may be, actively engaged in the insurance brokerage business of the copartnership or corporation in this State hold an unexpired license as an insurance broker issued in accordance with the provisions of this act.
*93 Nothing more is required of the corporation than that it pay the $25.00 (now $35.00) fee and that all of its active officers be licensed individually.
In urging that AGL's failure to secure a license should be conclusive against its right to bring this action, the defendants point to N.J.S.A. 17:22-6.18, which provides in part:
No insurance company or licensee shall pay any money or commission or brokerage or give or allow any valuable consideration ... to any person, partnership, association or corporation, other than a licensee, for or because of service rendered or performed in this State in negotiating or effecting in this State a contract of insurance on any property, or insurable interests, or business activities located within or transacted within this State ...
However, nothing in the act prohibits actions by unlicensed brokers to recover for breach of contract. Compare N.J.S.A. 45:15-3, which does contain such a prohibition with respect to real estate brokers.
Also relevant to the issues presented are N.J.S.A. 17:22-6.25, which subjects to a $1,000 penalty for an initial offense and a $2,000 penalty for each succeeding offense "any person, persons or corporation violating any of the provisions of this act" (emphasis added); and N.J.S.A. 17:22-6.20, which declares it unlawful "for any person (emphasis added), without conforming to the * * * act, * * * to represent himself to be the agent of any insurance company * * * or to solicit, negotiate or effect in this State any contract of insurance or renewal thereof. * * *"
In Tanenbaum v. Sylvan Builders, Inc., 29 N.J. 63 (1959), the Supreme Court held that an unlicensed realty broker could not maintain a tort action for interference with a contract of brokerage. The statute there involved, as noted above, expressly disallows an action for recovery on a realty brokerage agreement by an unlicensed broker, and the court held the statutory policy so reflected was equally applicable to the maintenance of a tort action by such a broker. The instant situation is distinguished by the absence *94 of an express prohibition of right to sue in the insurance statute and the fact that the individual brokers who actually did the soliciting, etc. were duly licensed.
The problem confronting us here has been discussed in 12 C.J.S. Brokers § 67, p. 155 as follows:
An objection that plaintiff may not recover compensation for services as a broker because he is not licensed as required by statute or ordinance is of no avail ... where such statute or ordinance is merely a revenue measure, not regulating the business of brokerage, and not disclosing any intent to invalidate acts done or contracts entered into by a person without a license. Even though the statute requiring a license is not a revenue measure, yet where it cannot be said that its object is to protect the community against unqualified and incompetent brokers, the absence of a license does not prevent the broker from recovering compensation. On the other hand, an unlicensed person may not recover compensation for services as a broker where a statute or ordinance requiring a license is applicable and such statute or ordinance is of a regulatory nature, was enacted in the exercise of the police power for the purpose of protecting the public, requires a license as evidence of qualification and fitness, and expressly precludes an unlicensed person from recovering compensation by suit, or at least manifests an intent to prohibit and render unlawful the transaction of business by an unlicensed person. (Emphasis added.)
While basically in agreement with the foregoing, 6A Corbin Contracts (1962) § 1512, pp. 710-713 warns against mechanical application of the revenue-police power dichotomy, pointing out (at p. 713):
The statute may be clearly for protection against fraud and incompetence; but in very many cases the statute breaker is neither fraudulent nor incompetent. He may have rendered excellent service or delivered goods of the highest quality, his non-compliance with the statute seems nearly harmless, and the real defrauder seems to be the defendant who is enriching himself at the plaintiff's expense. Although many courts yearn for a mechanically applicable rule, they have not made one in the present instance. Justice requires that the penalty should fit the crime; and justice and sound policy do not always require the enforcement of licensing statutes by large forfeitures going not to the state but to repudiating defendants.
We here conclude that where the operating individuals of the corporate principal are fully qualified and licensed *95 insurance brokers the failure of the corporation, which cannot itself be trained and qualified as such independent of its operating personnel, to have paid the $25 fee for a license, should not bar it from access to the courts. The statute does not articulate such a consequence, as do others of cognate nature, and neither sound policy nor the interests of justice as between plaintiff and the defendants call for such an excessive penalty for mere failure to pay a licensing fee. See Bundy v. Liberty Life Ins. Co., 150 Kan. 658, 95 P.2d 550, 553 (Sup. Ct. 1939).

II.
We are in disagreement with the trial court's dismissal of the plaintiff's contract claim against CWV at the end of the plaintiff's case.
In the first place, CWV is unsound in arguing, and so was the trial court in declaring that CWV's letter of March 2, 1963 to AGL could not be the foundation of a binding contract, because a mere offer which could be revoked at any time until fully accepted. An offer which invites acceptance by performance, rather than by a promissory acceptance, will give rise to a binding contract when the offeree begins the invited performance or tenders part of it. Restatement of Contracts, § 45 (1932); Restatement of Contracts, Second, § 45, Tent. Dr. No. 1 (approved 1964; Tent. Dr. No. 2, 1965, p. vii); and see Friedman v. Tappan Development Corp., 22 N.J. 523, 533 (1956); Grossman v. Calonia Land & Imp. Co., 103 N.J.L. 98 (E. & A. 1926); and Vicarisi v. Weeden, 109 N.J.L. 513 (E. & A. 1932).
In the present instance AGL accepted CWV's offer by proceeding to execute the invited performance  the solicitation of CWV's membership roster  and consummating life insurance contracts with many hundreds of the members.
CWV contends, alternatively, that the contract, if any at all, was void as not sufficiently definite as to term, or in any event was terminable by it at will. We disagree *96 with both of these contentions. It seems to us beyond dispute that the only fair and reasonable interpretation of the agreement, in the context of all the surrounding circumstances, was that the arrangement should endure as long as mutually satisfactory to the parties, but not for less than a reasonable time.
It is generally held that where the duration of a broker's agency is not fixed by the terms of the contract of employment, it continues only for a reasonable time. 12 C.J.S. Brokers § 16, p. 44; Kaufman Inc., etc. v. American Mach. & F'dry. Co., 102 N.J. Super. 1, 12 (App. Div. 1968), aff'd 54 N.J. 239 (1969); and Dixie Mill, &c., Co., Inc., v. H.B. Smith Machine Co., 128 N.J.L. 242, 246 (Sup. Ct. 1942).
If, for example, to take an extreme case, CWV had chosen summarily to break off the contract at the end of the first year this would clearly have been unfair and unreasonable since AGL was obviously looking to renewal as well as first-year commissions on premiums as the expected measure of its compensation for selling insurance to CWV members. We agree with CWV's contention that it should not forever be bound to AGL. But at the same time we are clear that the arrangement contemplated it would endure for a reasonable time so that AGL could realize at least a minimally fair return for the effort it expended in enrolling members in the program. In our judgment a jury could have found that three years was less than a reasonable time to terminate this agreement. As noted above, a major portion of the compensation expectable by AGL for its work would consist of renewal premiums for the duration of the policy in force. While this would be variable, depending on how long the individual insured paid his premiums and on his life expectancy, we cannot say as a matter of law that a cutoff of plaintiff's rights at the end of three years was reasonable under all the circumstances. The issue was for the jury.
*97 The dismissal of plaintiff's contract claim against CWV must be reversed so that the issue of whether the contract was terminated in less than a reasonable time may be determined as a question of fact at a new trial.
We conclude that the same disposition should attend CWV's contention that it had good cause to terminate the agreement because of AGL's allegedly inadequate performance under the contract. It may be pointed out, as noted above, that CWV did not raise the level of membership in the program during its own subsequent administration of it. The issue of good cause is one of controverted fact for trial determination.
As to CWV's argument that the subject matter of the contract came to an end when NAL cut down the scale of benefits payable, it is clear to us that CWV acquiesced in this decision, albeit reluctantly; that such a possibility was implied in the tripartite arrangement as entered into, and that there is no just factual basis for a finding that this constituted a default by AGL or destroyed an essential element of the contract.

III.
We are in accord with NAL's position that it was contractually free of liability vis-a-vis AGL when CWV dismissed AGL as both broker and administrator under the contract. (Distinguish the considerations pertinent to AGL's tort claim against NAL; see infra.)
NAL had deliberately insisted, over initial AGL objection, in incorporating into the contract between them the aforequoted provision terminating NAL's obligation if CWV appointed a new agent of record or administrator. CWV had done this by substituting itself for AGL as administrator. Plaintiff argues that NAL could not invoke the clause because it had itself caused this condition to occur. We do not agree that any fair finding of fact to that effect is possible on the proofs. It was CWV which decided for itself that AGL was to be eliminated. It was CWV which decided *98 that it would itself become the administrator and that if NAL refused to go along with that arrangement (and restore the initial scale of benefits) CWV would look for another carrier. NAL was in the position of having to go along or losing the business. While there may be a question as to whether everything it did in this regard is excusable from the perspective of tort liability to AGL (see infra), we are clear it did not cause CWV's elimination of AGL, within or by analogy to the principle that a party to a contract who renders its performance impossible cannot immunize himself for liability for breach thereof based on the defense of such impossibility of performance.

IV
We next consider the tort claims against CWV and NAL which were dismissed by the trial judge at the end of the whole case.
Tort liability for interference with prospective economic benefit arises when the conduct of the defendant is not in the reasonable exercise of an equal or superior right. Louis Schlesinger Co. v. Rice, 4 N.J. 169, 180 (1950). In adjudging whether that criterion has been met the inquiry is whether defendant's conduct has been "both injurious and transgressive of generally accepted standards of common morality or of law," Sustick v. Slatina, 48 N.J. Super. 134, 144 (App. Div. 1957) and cases cited therein. Put another way, were the actions of the defendants in their effect upon plaintiff's economic expectancies "sanctioned by the `rules of the game'"? 1 Harper and James, Law of Torts (1956) § 6.11, p. 510; or "conduct below the behavior of fair men similarly situated," Harris v. Perl, 41 N.J. 455, 461 (1964).
Any determination that defendants did not technically breach their contracts with plaintiff is not necessarily determinative of the absence of liability in tort. Cf. Harris v. Perl, supra (41 N.J. 461-462). We have decided that CWV had the right insofar as contractual liability is concerned *99 to terminate AGL's participation in the program as administrator, broker or both after a reasonable time. But the tort question is whether it was fair dealing also to design and execute a plan to appropriate for itself AGL's expectancy in the renewal brokerage commissions (including those beyond the reasonable time period), when it was not an insurance broker, and also, in effect, to obtain broker's fees on new insurance certificates through what a jury might consider the subterfuge of adding AGL's former brokerage allowance to its (CWV's) newly acquired administrative allowance.
AGL had developed this whole program for CWV, and CWV's purported interest therein was merely to service its members and to provide an attractive insurance benefit as a means of getting new members and retaining old ones. AGL had an expectancy of continuing to participate in the plan indefinitely. Cf. Harris v. Perl, supra (41 N.J., at 461-463). Was it in accordance with fair "rules of the game" for CWV not only to terminate AGL but also to move into its expectancy of future brokerage earnings for its own financial benefit? There may be arguable justificatory answers to these questions, but we think that, in totality, the evidence required submission of the tort issue to the jury.
We take the same position in relation to potential tort liability of NAL.
We think contemplation of the proofs of record, measured against the legal standard of liability, raises a question of fact so far as NAL is concerned. A jury might reasonably find that the way in which NAL cooperated to enable CWV to substitute itself for AGL in the rearrangement of the insurance program was not consonant with good business morality. NAL not only agreed to give CWV the administration expense formerly allowed AGL but also agreed to pad that item so as, in effect, to give it the brokerage commissions. And this notwithstanding evidence that NAL officers did not regard it as good insurance practice to permit a lay group to be acting as insurance brokers. They insisted *100 upon the window dressing of naming a nominal licensed broker who would, however, get no commission since the allowance therefor was being given to CWV as purported additional administrative expense.
Of course a jury might find, on the other hand, that, vis-a-vis AGL, NAL was acting in the exercise of an equal right on the theory that AGL had been trying to preserve for itself the benefits of the program at the expense of NAL by looking for a new insurer to supplant it on the CWV insurance program and that NAL, in cooperating with CWV, was merely acting defensively in preservation of its own interests. But the choice between this and less favorable views of NAL's conduct, was, on the whole fact spectrum, one for the jury as an issue of fact.

V
Plaintiff also argues error in the trial court having excluded from evidence formal admissions made by defendant NAL pursuant to demand therefor by plaintiff. These consisted of mathematical computations of the present value of loss of future income from the brokerage arrangement assuming various annual sums, periods of time and rates of return. NAL had on pretrial motion before a different judge objected to the demand as improper and was overruled. In consequence it subsequently made the admissions. But on its objection thereto on grounds of admissibility when plaintiff offered the admissions at the trial they were excluded.
Plaintiff's argument is that the admissibility in evidence of the information thus factually conceded by NAL was established affirmatively on the pretrial motion and was therefore binding on the defendants and the trial judge as the "law of the case." We are clear that the premise is incorrect and we are therefore not required to examine legal implications of the "law of the case" doctrine which might otherwise have been involved.
Plaintiff's original request for admissions expressly stated that it was made "subject to pertinent objections to *101 admissibility which may be interposed at trial." When, on the argument of defendants' motion objecting to the request for admissions, the motion judge ruled adversely to defendants, they stated their understanding that that decision did not bear upon any question of admissibility in evidence of the data which defendants might raise at trial. Both the motion judge and plaintiff then expressly declared their concurrence in that understanding. Moreover, the colloquy on the motion clearly indicates that the judge was not purporting to deal with competence or admissibility of any answers to the request for admissions. In the light of the foregoing it would obviously be unjust to treat the motion judge's ruling as a determination of the admissibility in evidence of the data involved. Therefore the trial judge was free to pass upon admissibility at the trial.
Since the merits of the evidence question involved have not been argued on the appeal we are in no position to express an opinion thereon.
The judgment is reversed and the cause is remanded for a new trial.
KOLOVSKY, J.A.D., dissenting.
The claims for relief asserted by plaintiff Association Group Life, Inc. (AGL) against Catholic War Veterans of the United States of America (CWV), both that charging breach of contract and that alleging malicious interference with plaintiff's prospective economic advantage, are bottomed on a letter dated March 2, 1963, drawn by plaintiff's attorney and signed by the officers of CWV. The letter warrants reproduction in full:
 Association Group Life, Inc.
 2022 Morris Avenue
 Union, New Jersey.
Gentlemen:
Confirming our agreement with you and for and in consideration of One ($1.00) Dollar and other valuable consideration receipt of which is hereby acknowledged, it is agreed that:

*102 1. Association Group Life, Inc., is hereby authorized to solicit our members and their families for a special program of life insurance being offered by the North American Life & Casualty Company of Minneapolis, Minnesota. [NAL]
2. We agree to make available to you annually during the period of existence of this organization a written list of names and addresses of all our members.
3. The undersigned certify that this agreement and the signing hereof was authorized by resolution at a regular National Board meeting of the Catholic War Veterans of the United States of America on March 2, 1963.
 /s/ Edward F. McElroy 
 Edward F. McElroy, National
 Commander
 /s/ Gerald M. Collins 
 Gerald M. Collins, Adjutant
 General
 /s/ Cresenzie W. Castaldo 
 Cresenzi W. Castaldo, National
 Judge Advocate & Chairman of
 Insurance Committee.
The letter specifies no term or duration for the arrangement provided thereby beyond that to be implied from the fact that it authorized solicitation "for a special program of life insurance" then offered by NAL, a program which, it may be noted, actually existed only until June 28, 1965 when the benefits thereafter payable under the group policy were substantially reduced by NAL.
The majority opinion rejects CWV's contention that the arrangement evidenced by the letter of March 2, 1963 was terminable at will, but agrees that "it was never contemplated that [CWV] should forever be bound to AGL on the agreement between them." The majority opinion concludes that the "fair and reasonable interpretation of the agreement * * * was that the arrangement should endure as long as mutually satisfactory to the parties, but not for less than a reasonable time."
I query whether it is proper to fail to give full effect to the language of the writing limiting the arrangement to the "special program of insurance" then being offered by NAL.
*103 But even accepting arguendo the majority's interpretation of the agreement, I am nonetheless of the view that the trial court acted properly in taking the case against CWV from the jury. In my opinion, the circumstances revealed by the record in this case were such as to mandate a finding that CWV acted within its rights when by notice dated March 26, 1966 it terminated the arrangement as of June 30, 1966, more than three years after it had been entered into.
Application of the standard for determining when a motion for judgment should be granted at the close of the proofs in a jury case, (see Franklin Discount Co. v. Ford, 27 N.J. 473, 487 (1953)), satisfies me that in view of all that had transpired between March 1963 and March 1966, the proofs precluded a jury finding that a reasonable time had not expired by March 1966.
Further, it appears without contradiction that by March 1966 the arrangement was no longer satisfactory to CWV. Nothing in the proofs would support a finding that CWV's repeated expressions of dissatisfaction were not in good faith; quite the contrary. That dissatisfaction stemmed in part from the 1965 reduction in policy benefits, a factor whose materiality was recognized by AGL itself for, as its officer Witzberg testified, early in 1966
We went out and solicited other companies in order to get another carrier for this case figuring we could move it from North American into another company that would provide the benefits back again and we were successful in doing so.
(It may be noted that nothing in the arrangement between AGL and CWV would have compelled CWV to accept the new program which AGL says it was prepared to offer.)
An even more significant factor was CWV's expressed dissatisfaction with AGL's administration of the life insurance program. High among the reasons for such dissatisfaction was the fact that during the period of almost three years between March 1963 and March 1966 AGL had enrolled *104 only some 1700 of CWV's 43,000 members in the life insurance program with only 140 additional members being enrolled in the period from July 1964 to March 1966.
AGL's failure to enroll more members in the life insurance program was of vital significance to CWV. It appears, without contradiction, that its arranging for such a program, which resulted in monetary gain only to AGL and NAL, was motivated by a desire to offer to its membership a program of life insurance which would be beneficial to its members and would serve to hold CWV's existing membership and attract new members.
Whether AGL's alleged deficiencies in performance were of such magnitude as to justify termination for cause were this a contract for a definite term is irrelevant to the issues presented. What is relevant is that the uncontradicted proofs show that CWV acted in good faith in determining to undertake itself the administration of the group life insurance program if NAL would agree, as it thereafter did, to restore the original benefits of the group policy. The proofs afford no basis for inferring that CWV's decision was motivated by the fact that the arrangement between it and NAL contemplated that CWV would receive for its services and expenses in promoting and administering the insurance program an amount substantially equivalent to the amount which AGL would have received if the original arrangement had continued.
I would hold that the relevant proofs established as a matter of law that CWV did not breach its contract when it terminated its arrangement with plaintiff and that its doing so, and its entering into a new arrangement with NAL was "in the exercise of [its] equal or superior right," (Louis Schlesinger Co. v. Rice, 4 N.J. 169, 181 (1950)), so as to preclude the claim that it maliciously interfered with plaintiff's prospective economic advantage.
So, too, I would hold that NAL's participation in the new arrangement with CWV affords no basis for holding it liable in tort to plaintiff. I agree with the majority that *105 the provisions of the broker's agreement between NAL and AGL bar successful maintenance of an action for breach of contract by AGL against NAL.
I would affirm the judgments in favor of both defendants.