**RAUL INTERNATIONAL CORPORATION, Atlas Continental Corporation, Western Atlas Corporation, and Curtis Automotive Corporation, Plaintiffs,**

v.

**SEALED POWER CORPORATION, Defendant.**

**Civ. A. No. 83–536.**

United States District Court,
D. New Jersey.

April 3, 1984.

Riker, Danzig, Scherer & Hyland by Douglas S. Eakeley, Morristown, N.J., for plaintiffs.

Scarpone & Edelson by James Scarpone, Newark, N.J., Gardner, Carton & Douglas by Edward B. Hirshfeld, John T. Cusack, Michael P. Padden, Chicago, Ill., for defendant.

## OPINION

SAROKIN, District Judge.

This action is before the court on defendant's motion for summary judgment.[1] Among other issues, the case presents a matter of first impression concerning the scope of the Robinson-Patman Act.

## FACTS

Plaintiffs are four related corporations engaged in the packaging of automotive replacement parts and their distribution in the United States and internationally. All four corporations are owned by Gene and Albert Raul, who are brothers; each is incorporated in New York and has a principal place of business in Carlstadt, New Jersey. Defendant Sealed Power Corporation, a Delaware corporation with its principal place of business in Michigan, manufactures and distributes automotive engine parts. Defendant produces and plaintiffs package and distribute, among other products, valve tappets. Also known as "lifters," valve tappets are part of the valve train in a piston engine and control the combustion and timing of the engine by opening and closing the intake and exhaust valves of the pistons. Valve tappets are in constant motion while an engine is operating. They therefore wear out quickly and require frequent replacement.

For approximately twenty years, plaintiffs have distributed valve tappets; indeed, they have comprised plaintiffs' most profitable line. During this time, plaintiffs' primary, if not exclusive, source of valve tappets has been defendant or its predecessor, Johnson Products. According to defendant, it is an important but not dominant producer of valve tappets—fifth largest in the world, and fourth in the United States. Plaintiffs, however, argue that "Sealed Power is the dominant factor in the valve tappet aftermarket," that is, the market for replacement parts sold under names other than those of the automobile manufacturer and marketed outside of such manufacturers' respective chains of distribution.

In their complaint, plaintiffs allege antitrust violations, as well as violations of the common law of contracts and torts. According to plaintiffs, defendant has engaged in price discrimination and other pricing policies in an effort to drive plaintiffs out of business. Further, defendant has allegedly misrepresented that its prices were the most favorable it was offering, tortiously interfered with plaintiffs' relationships with their customers and breached its contract with plaintiffs by virtue of its pricing policies and its practice of competing with plaintiffs for plaintiffs' own customers. Defendant denies plaintiffs' allegations and now moves for summary judgment on all five counts of plaintiffs' complaint.

## DISCUSSION

A. *Count I: Violation of the Robinson-Patman Act, 15 U.S.C. § 13(a)*

Title 15 U.S.C. § 13(a) states, in pertinent part:

(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them ...

---

1. Plaintiff's motion for sanctions pursuant to Fed.R.Civ.P. 37(b)(2) has been referred to Magistrate Haneke and, because their cross-motion for summary judgment is, to a large extent, dependent upon the sanctions thus invoked, that motion has been referred to the magistrate for a report and recommendation.

Defendant concedes that, if true, the allegations of plaintiffs' complaint do, in fact, state a claim under the Robinson-Patman Act. However, it moves for summary judgment on one ground alone: that the Robinson-Patman Act does not apply because export transactions are specifically excluded from the provisions of the Act. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd.,* 402 F.Supp. 244, 248 (E.D.Pa.1975), *pet. denied,* 521 F.2d 1399 (3d Cir.1975); *Fimex Corp. v. Barmatic Products Co.,* 429 F.Supp. 978, 979–80 (E.D.N.Y.1977), *aff'd without opinion,* 573 F.2d 1289 (2d Cir.1977).

In support of this motion, defendant offers the deposition testimony of Eugene Raul, president and chief executive officer of the plaintiff corporations. In particular, defendant relies upon the following colloquy:

Q. Is it a fact, sir, that since 1980 most of the tappets which you have purchased from Sealed Power have been resold to customers located in foreign countries?

A. Yes.

Q. And isn't it a fact, Mr. Raul, that by far most of your customers for tappets which you have purchased from Sealed Power have been sold to customers located in foreign countries?

A. Isn't that the same question?

Q. I said by far most of.

A. Yes.

Defendant also argues that it understood that plaintiffs were to export all of the valve tappets purchased from defendant, an understanding gleaned both from plaintiffs' purchase orders and from a statement of Mr. Raul to that effect.

Plaintiffs controvert these facts. Raul testified at deposition and contends in his certification that plaintiffs have and have had domestic customers, responsible for between 11% and 58% of their total sales during the last five years. Indeed, Raul claims, defendant "even introduced us to two customers located in New Jersey." Additionally, Raul states that plaintiffs' purchase orders are worded as they are for tax reasons, irrelevant to these particular products. He also claims that he never represented that his sales were solely for export.

■ Plaintiffs' claims in the papers submitted in opposition to defendant's motions for summary judgment are not inconsistent with earlier deposition testimony. Taken together, they create a genuine issue of material fact as to whether plaintiffs sold solely for export. Similarly, although defendant offers convincing evidence that Chrysler Interparts, in favor of whom defendant allegedly price discriminated, purchased valve tappets solely for export, neither is this issue appropriate for summary judgment. Persuasive evidence in support of defendant's position appears in an internal Sealed Power memorandum, as well as in an April 12, 1982 article published in *Automotive News.* However, Mr. Raul's deposition testimony and certification create a genuine issue of material fact as to Interparts' sales: he states that Interparts in fact sells to domestic customers. Indeed, Interparts allegedly offered to sell valve tappets to Raul; as discussed, *supra,* these would not necessarily have been exported. *See generally Paceco, Inc. v. Ishikawajima-Harima Heavy Industries Co., Ltd.,* 468 F.Supp. 256, 260 (N.D.Calif.1979) (questions of fact as to this jurisdictional requirement not suitable for resolution on motion to dismiss).

■ Regardless of these factual issues, however, the court does not believe that the export exemption contained within the Robinson-Patman Act applies to the instant situation. The Act applies only to the pricing of commodities which are "sold for use, consumption, or *resale* within the United States ..." (emphasis added). Defendant argues that this provision ought to be construed to exempt transactions involving any goods that are ultimately exported. Dicta in several cases support this position. *See Zenith Radio Corp. v. Matsushita Electric Industrial Co., Ltd., supra,* 402 F.Supp. at 248; *Fimex Corp. v. Barmatic Products Co., supra,* 429 F.Supp. at 979.

However, the language of the statute does not: Congress made the Act applicable to cases involving resale within the United States. Had it intended the Act to apply only to goods ending up in the United States, it would have omitted the word "resale" from the statute, instead providing only for domestic "use or consumption." It did not do so and only by ignoring the word "resale" is defendant's construction rendered plausible.

Nor is defendant's interpretation consistent with the legislative history of the Act, the caselaw interpreting it or the purposes behind it. The legislative history of the provision is sparse and not altogether clear. When, in 1936, the Robinson-Patman Act was passed, amending the Clayton Act, the "use, consumption or resale within the United States" clause was, as the Senate Judiciary Committee recognized, merely retained from the Clayton Act. Report of the Senate Committee on the Judiciary, S.Rep. No. 1502, 74th Cong., 2d Sess. (1936) at 4. The House Judiciary Committee Report, on the other hand, made no mention of the provision. *See* Report of the House Committee on the Judiciary, H.R.Rep. No. 2287, 74th Cong., 2d Sess. (1936). Congressional debate on the matter was cursory. Thus, for example, the following colloquy occurred on the Senate floor on April 29, 1936:

> MR. LOGAN. ... The purpose of the bill is to compel the treatment of all customers exactly alike when the same situation applies to all of them.
>
> MR. VANDENBERG. If the Senate will further permit me, I wish to ask another question. Would that apply equally to a customer in the United States and a customer out of the United States?
>
> MR. LOGAN. I do not think it applies to a customer out of the United States.
>
> MR. VANDENBERG. The Senator does not think the provision he is talking

about would prevent sales of surplus products abroad at lower prices?

> MR. LOGAN. I do not. As I recall, the provisions of the bill are confined specifically to the United States and possessions of the United States.
>
> MR. VANDENBERG. Is there any doubt about that?
>
> MR. BORAH. I think not.

80 Cong.Rec. 6330, 6333 (1936). This debate sheds little light on the question, except to make clear that the export exemption was intended by Congress to permit sales outside of the United States at prices lower than those charged domestically. One turns, therefore, to the legislative history of the Clayton Act, from which the provision here at issue was lifted. The House and Senate Judiciary Committee Reports on the Clayton Act include identical language, which defendant argues supports its interpretation. They state:

> It will be observed that the language used makes this section applicable only to domestic commerce, or, in other words, its application is restricted to commerce carried on in the United States, or in places under the jurisdiction thereof, and *has no reference to commodities sold either in this country or abroad which are intended solely for our export trade.*

H.R.Rep. No. 627, 63d Cong., 2d Sess. (1914) at 8; S.Rep. No. 698, 63d Cong., 2d Sess. (1914) at 3 (emphasis added). Although this passage correctly notes that the focus of the Robinson-Patman Act is upon domestic commerce, it does not aid the court in drawing the line between such commerce and "our export trade" where, as here, there are numerous domestic transactions prior to the actual exporting of the commodities at issue. Nor does it explain why Congress chose to employ the term "resale" in the statute;[2] indeed, it

---

**2.** To the extent that the use of the word "resale" renders the statute unambiguous on its face, the court ought not look to legislative history at all. It is an "ancient canon of statutory construction that where a statute is clear and unambiguous

on its face any resort to legislative intent is unwarranted." *Bondholders Protective Committee v. I.C.C.,* 432 F.2d 268, 271 (3d Cir.1970) (citing authorities). Adherence to this canon supports plaintiffs' position.

does not discuss resale at all, but only sales of goods abroad *or directly to exporters.*

■ In interpreting the Robinson-Patman Act, courts have consistently looked to the meaning of the Act provided by its co-author, Congressman Wright Patman, in his book *The Robinson Patman Act* (1938) (hereinafter "Patman"). *See Baysoy v. Jessop Steel Co.,* 90 F.Supp. 303, 305 (W.D. Pa.1950), cited in *Fimex Corp. v. Barmatic Products Co., supra,* 429 F.Supp. at 979. Indeed, both plaintiff and defendant cite a passage in Patman's book and argue vehemently over its meaning, which, on its face is nothing more than a restatement of the statutory language. Patman writes:

> ... in applying the Act to export sales, it is evident that no limit or regulation of price discrimination in such sales is intended, unless goods involved in such transactions are resold for use, consumption or resale in any place under the jurisdiction of the United States. It is likewise apparent that the parties to any sales transaction, regardless of where the parties are located, are not subject to the price-discrimination provisions of the Act, unless such goods are sold for resale in, or are used or consumed in, any place under the jurisdiction of the United States.

Patman at 208. The first sentence of the paragraph indicates that the Act does not apply to export sales, unless the exported goods are resold such that they end up in the United States. Thus, a seller may not work around the provisions of the Act simply by exporting the goods at issue, and then *re-importing* them, a scenario not alleged here.[3] The second sentence merely restates the language of the statute. Congressman Patman did, however, comment upon the situation alleged here:

*Question.* We are in the export business and have been buying seeds for export at special prices to meet competition in foreign markets. Our suppliers now tell us that because of the Robinson-Patman Act they cannot give us these special prices for export. Is this a correct interpretation of the Act?

*Opinion.* We believe your suppliers are in error in such an interpretation. If your *next immediate resale* is to parties located in any place not under the jurisdiction of the United States, and not for ultimate use, consumption or resale in any place under the jurisdiction of the United States, the purchase transaction by which you have *immediately* obtained title to the goods is not subject to the price-discrimination provisions of the Act.

Patman at 210 (emphasis supplied). It is clear from this example that, unless the next immediate resale is for export, as was not the case here, a given domestic transaction was meant to be covered by the Act. For this reason, it does not appear that the export exemption applies to the instant situation in which defendant's sales to Interparts and plaintiffs were two domestic transactions removed from export. The legislative history thus supports plaintiffs' position.

Nor are the decisions construing the export exemption to the contrary, notwithstanding their sweeping language. Thus, in *Zenith Radio Corp., supra,* Judge Higginbotham held that "no cause of action arises under the Act unless both commodities involved in the alleged price discrimination are 'sold for use, consumption, or resale within the United States.'" 402 F.Supp. at 248. That case involved sales by Japanese manufacturers to both Japa-

---

**3.** It should be noted that the converse situation, in which a buyer "works around" the export exemption by structuring a transaction in order to reap undeserved benefits of the Act, is a logical absurdity. Especially in cases involving the exercise of monopoly power by sellers, it is such sellers, and not their buyers, who control the structure of the sales. Thus, if Sealed Power wanted its transactions to fall within the terms of the export exemption, the court has little

doubt that it could effectuate such purpose, by selling directly abroad or to an exporter. Small sellers, on the other hand, who require multiple domestic transactions in order to be able to export their goods would not fall within the provisions of the Act because they would not, in any event, be able to price discriminate with the effect of lessening competition or tending to create a monopoly, as required by § 13(a).

nese and American markets; it did not present the issue now before the court of whether sales to middlemen who then sell to exporters are also exempted from the Act. Nor did *Fimex Corp. v. Barmatic Products Co., supra,* confront this issue. There, the court simply held that if all sales to a buyer are for resale abroad, such sales are not covered by the Act. 429 F.Supp. at 979–80. However, plaintiff in *Fimex* exported his purchases directly and the court found that under any of the three tests for export—seller intent, buyer intent or the ultimate location of the resale—such transactions fell outside the scope of the Act. Hence, the instant issue is one of first impression. In deciding it, the court relies on the above cited legislative history, as well as policy considerations, rather than on the dictum of cases not factually applicable.

■ The policy reasons in support of plaintiff's position are most compelling. The Robinson-Patman Act was designed to proscribe price discrimination; the export exemption removed this proscription in order to allow American producers and exporters flexibility in adjusting their prices to fit the demands of foreign markets. Here, these two policies collide. In order to be competitive with foreign valve tappet manufacturers, defendant ought to be allowed to vary the prices of the goods ultimately bound for export from those sold domestically. On the other hand, where such export only occurs after a series of domestic transactions, those transactions, having their impact on the American economy, must be governed by laws against price discrimination.

■ The statute passed by Congress engenders an ingenious accommodation of these competing concerns. Where a manufacturer sells to a customer abroad, such transaction is not covered by the Act. Where he or she sells to an exporter who sells to a customer abroad, these transactions are likewise exempt. Where, however, two (or more) sales precede the export transaction, Congress sensibly provided that at least the first such sale(s), which

can reasonably be considered to be in domestic commerce, ought to be governed by the strong public policy against price discrimination. Congress drew the line between export-oriented sales and domestic economic activity by exempting the export transaction and the sale to the exporter, but not additional domestic transactions. It did so by utilizing the word "resale" in the text of the statute. The court will give full effect to that language and to the policy concerns behind it. Defendant's motion for summary judgment on Count I is denied.

**B.** *Section 2 of the Sherman Act, 15 U.S.C. § 2*

Defendant also moves for summary judgment on Count II of plaintiffs' complaint. The gravamen of that Count is stated in paragraph 17 of the complaint:

> During the past several years, defendant, in an effort to strengthen and maintain its overwhelmingly dominant position in the valve tappet aftermarket and in an effort to obtain a monopolistic position in sales and distribution of valve tappets to the aftermarket, has engaged in a course of conduct whereby the prices at which it sells valve tappets to plaintiffs are so close to the prices at which it sells to wholesalers who buy both from plaintiffs and directly from defendant, that plaintiffs cannot compete with defendant.

Defendant's motion for summary judgment as to this allegation consists of a three-pronged attack: first, that plaintiffs' allegations amount to a demand for price discrimination and thus, fail to state a claim under § 2; second, that because Sealed Power does not have sufficient market power to create a monopoly, plaintiffs cannot, as a matter of law, make a *prima facie* showing of attempted monopolization; and third, that the undisputed fact of defendant's sales to Chrysler Interparts proves Sealed Power's lack of intent to monopolize.

■ First, defendant's argument that what plaintiffs would require is price dis-

crimination in their favor is an appealing one. Indeed, such price discrimination might well be illegal, at least in the absence of a showing that, for example, it occurred in order to meet a competitor's price. *See* 15 U.S.C. § 13(b); *United States v. United States Gypsum Co.*, 438 U.S. 422, 450–51, 98 S.Ct. 2864, 2880–81, 57 L.Ed.2d 854 (1978). *See generally Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983). However, neither party has briefed or addressed the only possible legal basis for plaintiffs' allegation: namely, that defendant may be selling to plaintiffs' former customers at a price so low as to constitute predatory pricing in violation of § 2. In proving that this is the case, plaintiffs bear a heavy burden: they must allege and prove

> (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed to accomplish the unlawful purpose; and (3) a dangerous probability of success.

*William Inglis & Sons Baking Co. v. ITT Continental Baking Company, Inc.*, 668 F.2d 1014, 1027 (9th Cir.1981), *cert. denied*, 457 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). *See generally* P. Areeda and D. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697 (1975). This will be particularly difficult where, as here, the allegedly predatory prices charged by defendants are close to those charged plaintiffs: essentially, plaintiffs must argue that the price they themselves pay is too low. However, if plaintiffs are able to prove the price discrimination which they allege in Count I and re-allege in Count II, then they may also prevail here, arguing that, especially given the prices charged them by defendant, they cannot compete with the artificially low prices being charged others by Sealed Power.

■ Second, defendant argues that it does not have sufficient market power to be liable under § 2 for either monopolizing or attempting to monopolize. Having such power is clearly an element of a § 2 offense. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Borough of Lansdale v. Philadelphia Electric Co.*, 692 F.2d 307, 311 (3d Cir.1982); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 (3d Cir.1975) (attempt to monopolize). Defendant offers proof that it manufactures only 9.2% of the valve tappets produced in the United States and 5.3% of those produced in the world. Plaintiffs, however, argue that neither of these two figures relate to the market here relevant, the "aftermarket." Within this market, plaintiffs aver, "Sealed Power is the dominant factor … General Motors and Ford are original equipment manufacturers, and Eaton and Stanadyne do not directly market a branded tappet to the aftermarket." Certification of Gene Raul at 8. Defendant has not presented contrary evidence on the record, nor made available to plaintiff discovery with respect to its percentage of the aftermarket. In the absence of such discovery, summary judgment ought ordinarily to be denied. *See e.g.*, 6 *Moore's Federal Practice* ¶ 56.15[5], at 56–566; *Penn Galvanizing Co. v. Lukens Steel Co.*, 59 F.R.D. 74, 80 (E.D.Pa. 1973) (citing cases). However, in any event, ascertaining the relevant market involves a complex factual inquiry. *See, e.g., SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1062–63 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). Based on the evidence now before it, the court cannot therefore hold as a matter of law that defendant does or does not dominate the relevant market for valve tappets. The issue remains one for trial.

■ Finally, defendant argues that its sale of valve tappets to Chrysler Interparts demonstrates a lack of intent to squeeze independent distributors out of the market. This one fact, taken alone, does not establish defendant's lack of intent to monopolize, which is a factual issue not appropriate for summary judgment. *White Motor Co. v. United States*, 372 U.S. 253, 259, 83 S.Ct. 696, 699, 9 L.Ed.2d 738 (1963). *Cf., Fleer Corp. v. Topps Chewing Gum, Inc.*,

658 F.2d 139, 154 (3d Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982) (intent may be inferred from proof of actual monopoly power), citing *American Tobacco Co. v. United States*, 328 U.S. 781, 789, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946). Unable to find as a matter of law that defendant lacked the intent to monopolize, the court can easily envision such intent existing despite defendant's sales to Chrysler: for example, defendant may have been working in concert with Chrysler to monopolize, or it may have been attempting to eliminate one competitor at a time. Therefore, this argument must also fail at this point.

Defendant's motion for summary judgment on Count II is therefore denied. However, in light of plaintiffs' representation at oral argument to the effect that its allegation in Count II is not based upon predatory pricing, the court will condition this ruling upon the submission of an amended Count II. Such amendment should set forth a theory based upon either predation or upon a more clearly delineated course of monopolistic conduct than that thus far alleged. Upon such amendment, defendant will of course be permitted to make the appropriate motions to dismiss or for summary judgment, unless such motions seek merely to reargue the issues discussed herein.

## C.  *Common Law Claims*

Plaintiffs alleged three state common law claims, for fraudulent misrepresentation, tortious interference with contractual relations and breach of contract. Defendant has moved for summary judgment on each of these counts, which motions will be addressed *seriatim.*

Initially, the parties argue vehemently over whether New Jersey or Michigan law applies. However, each concedes that "there is no serious conflict of laws" question, since each of the above causes of action involves standards identical in the two jurisdictions. Defendant's Brief at 25; Plaintiffs' Brief at 25. In light of this concession and of the relative simplicity of the common law issues involved, the court chooses not to resolve the conflicts question here presented. Indeed, there is no conflict, and the court will accordingly make reference to the law of both jurisdictions.

■ With respect to plaintiffs' allegation of fraudulent misrepresentation, both New Jersey and Michigan have identified the following elements of that tort:

(1) a material misrepresentation of past or present fact;

(2) made by defendant with knowledge of its falsity or reckless disregard thereof;

(3) with the intention that plaintiff rely thereon;

(4) that plaintiff did, in fact, rely upon it;

(5) to his or her detriment.

*See, e.g., Jewish Center of Sussex County v. Whale*, 86 N.J. 619, 624–25, 432 A.2d 521 (1981); *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813, 816 (1976).

Plaintiffs, at least at first blush, state a claim of fraudulent misrepresentation. They allege in Count III that during the period pertinent to this action, defendant repeatedly represented that it was selling valve tappets to plaintiffs at its lowest prices, a fact which defendant knew to be false, intending to induce plaintiffs to purchase tappets in reliance thereon. Plaintiffs further allege that they did purchase in reliance thereon, to their great detriment.

■ Defendant attacks plaintiffs' fraudulent misrepresentation claim on three grounds. First, it argues that, as plaintiffs Atlas Continental Corp., Western Atlas Corp. and Curtis Automotive Corp. never purchased any valve tappets from defendant, summary judgment should be granted as against them. Plaintiffs respond that all of these corporations are owned by Gene and Albert Raul, that they are an integrated operation conducting business under several different names for marketing purposes, and that all of the plaintiffs sell defendant's valve tappets, a

fact of which defendant has been aware. To whom defendant was actually selling thus becomes an issue, as yet unexplored, of plaintiffs' corporate interrelationship: it is not, therefore, appropriate for summary judgment.

■ Second, defendant contends that because Chrysler Interparts is not a purchaser of valve tappets comparable to plaintiffs, the misrepresentation alleged was not false. Defendant states that plaintiffs in fact received defendant's lowest price, except for original equipment manufacturers such as Chrysler. This argument derives support from the much larger size of Chrysler; it is weakened by the fact that both plaintiffs and Chrysler distribute valve tappets to the international aftermarket. The issue of comparability is clearly one of fact. The court cannot say, as a matter of law, that either Chrysler's size or its sales activities render it comparable to plaintiffs. On this ground too, then, summary judgment is inapposite at this time.

■ Third, defendant argues that, as a fraudulent misrepresentation is only actionable if it relates to past or present fact, *Jewish Center of Sussex County v. Whale, supra,* 86 N.J. at 624, 432 A.2d 521; *Hi-Way Motor Co. v. International Harvester Co., supra,* 247 N.W.2d at 816, any such misrepresentation alleged here must have occurred between February, 1982, when defendant began to sell to Chrysler Interparts and August, 1982, when plaintiffs ceased purchasing valve tappets from defendant. The complaint alleges that defendant "repeatedly assured plaintiffs" that they were being offered defendant's best prices. Such allegation necessarily includes the period between February and August, 1982; defendant will not be heard to complain that the inquiry is in fact narrower and less "loose and imprecise" than the allegation in the complaint. In any event, defendant has not proved that no misrepresentations were made during the relevant period. Still immersed in issues of fact, Count III may not be resolved by summary judgment. Defendant's motion is denied.

■ Count IV alleges that defendant tortiously interfered with plaintiffs' business relationships by (a) selling to plaintiffs' customers at prices below those which plaintiffs could afford to charge, and (b) price discriminating against plaintiffs, thereby rendering plaintiffs' sales to its customers at competitive rates impossible. In both New Jersey and Michigan, a claim for tortious interference with business relations requires an allegation of interference with a continuing or prospective economic relationship that is both intentional and legally or ethically improper. *See Inventive Music, Ltd. v. Cohen,* 617 F.2d 29, 34 (3d Cir.1980), citing *Association Group Life, Inc. v. Catholic War Veterans,* 120 N.J.Super. 85, 98, 293 A.2d 408 (App.Div.1971), *modified on other grounds,* 61 N.J. 150, 293 A.2d 382 (1972); *System Operations v. Scientific Games Development,* 425 F.Supp. 130, 133–34 (D.N.J.1977); *Weitting v. McFeeters,* 104 Mich.App. 188, 304 N.W.2d 525, 529–30 (1981). Insofar as Count IV refers solely to defendant's having outmaneuvered plaintiffs in the marketplace, it must be dismissed; no claim is stated for the consequences of lawful competition. *Melveney v. McCrane,* 138 N.J. Super. 456, 462–63, 351 A.2d 385 (App.Div. 1976) (citing cases); *Weitting v. McFeeters, supra,* 304 N.W.2d at 530. However, insofar as Count IV alleges that defendant interfered with prospective economic relations by *illegally* discriminating in price between plaintiffs and others—a set of facts as yet unresolved, *see, supra* at 352 —it states a valid claim for tortious interference with business relations, and thus, precludes summary judgment unless and until the existence or absence of illegal price discrimination is factually established.

Finally, defendant's motion for summary judgment on Count V must also be denied. Count V alleges that an express or implied contract existed between plaintiffs and defendant as a result of specific representations made by defendant as well as the parties' course of dealing. This contract, the complaint contends, was breached by defendants "selling [plaintiffs] valve tap-

pets at prices that were too high to enable plaintiffs to compete in the aftermarket."

Defendant argues that no contract guaranteeing plaintiffs a profit arises from the parties' course of dealing. However, this is not what plaintiffs allege. Rather, the gravamen of their complaint is that the parties agreed "that Raul would be one of a limited number of [valve tappet] ... distributors" and that plaintiffs would receive defendant's most favorable prices, terms and conditions; plaintiffs also allege that defendant breached this agreement. Plaintiffs' Brief at 28. That a course of dealing may result in an implied contract is clear. *St. Paul Fire and Marine Ins. Co. v. Indemnity Ins. Co. of North America,* 32 N.J. 17, 24–26, 158 A.2d 825 (1960); *Kozlowski v. Kozlowski,* 164 N.J.Super. 162, 174, 395 A.2d 913 (Ch. Div.1978), *aff'd,* 80 N.J. 378, 403 A.2d 902 (1979); *Redinger v. Standard Oil Co.,* 6 Mich.App. 74, 148 N.W.2d 225, 228–29 (1967). Here, there is simply a dispute as to whether such a course of dealing in fact existed. Plaintiffs state that it did, until defendant's breach in 1977; defendant points to Mr. Raul's testimony to the effect that such breach occurred earlier, though the evidence it offers consists of written and oral complaints of Mr. Raul during 1978, after the alleged breach. Taken together, this evidence leaves unresolved the issue of whether and when the course of dealing existed. Nor is the factual issue resolved as to whether defendant's actions were in violation of the implied covenant of good faith inherent in all New Jersey and Michigan contracts. *See, e.g., Onderdonk v. Presbyterian Homes of New Jersey,* 85 N.J. 171, 182, 425 A.2d 1057 (1981) (citing cases); *Ihlenfeldt v. Guastella,* 42 Mich. App. 384, 202 N.W.2d 327, 331 (1972). For these reasons, defendant's motion for summary judgment on Count V is also denied.

All motions for summary judgment against plaintiff are hereby denied. An appropriate order will issue.